# IN THE SUPREME COURT OF IOWA

No. 16–1666

Filed June 22, 2018

**NOLAN DEEDS,**

Appellant,

vs.

**CITY OF MARION, IOWA; ST. LUKE'S WORK WELL SOLUTIONS; ST. LUKE'S HEALTHCARE;** and **IOWA HEALTH SYSTEM** d/b/a **UNITYPOINT HEALTH,**

Appellees.

---

On review from the Iowa Court of Appeals.

Appeal from the Iowa District Court for Linn County, Christopher L. Bruns, Judge.

Plaintiff seeks further review of court of appeals decision that affirmed summary judgment dismissing his disability discrimination claims. **DECISION OF COURT OF APPEALS AND DISTRICT COURT SUMMARY JUDGMENT AFFIRMED.**

Brooke Timmer, Katie Ervin Carlson, and Nathan J. Borland (until withdrawal) of Fiedler & Timmer, P.L.L.C., Johnston, for appellant.

Amy L. Reasner of Lynch Dallas, P.C., Cedar Rapids, for appellee City of Marion.

Karin A. Johnson, Samantha M. Rollins, and Mitch G. Nass of Faegre Baker Daniels LLP, Des Moines, for appellees St. Luke's Work Well Solutions, St. Luke's Healthcare, and Iowa Health System d/b/a UnityPoint Health.

**WATERMAN, Justice.**

In this appeal, we must decide whether the district court correctly granted summary judgment dismissing the plaintiff's disability discrimination claims. The plaintiff, who has multiple sclerosis (MS), applied for a full-time job as a firefighter. The defendant City declined to hire him after the physician performing its preemployment physical examination reported the applicant was not medically qualified for the position. The physician made that determination based on national firefighter guidelines that disqualify persons with MS with active symptoms within three years because MS symptoms could hinder job performance and thereby endanger rescuers and persons needing assistance in a fire emergency. The physician did not inform the City that MS was the reason the applicant was found unfit for firefighting, and the City did not inquire further into why the applicant was disqualified. The plaintiff did not inform the City he had MS or ask for any accommodation. Months later, he filed a complaint with the Iowa Civil Rights Commission (ICRC) alleging disability discrimination and then failed to accept the City's offer to explore reasonable accommodations through an interactive process.

The plaintiff instead sued the City and the physician's employer under the Iowa Civil Rights Act (ICRA), alleging disability discrimination by the City and that the physician aided and abetted the discrimination. The district court granted summary judgment for all defendants. The district court concluded that because the City was unaware of the plaintiff's MS, plaintiff could not prove the City declined to hire him because of that disability. And the district court ruled the medical defendants were not liable under the ICRA for providing an independent medical opinion in an advisory role. The plaintiff appealed, and we

transferred the case to the court of appeals, which affirmed the summary judgment over a partial dissent. We granted the plaintiff's application for further review.

On our review, we hold that the plaintiff could not prove the City discriminated against him *because of* his MS when the City was unaware he had MS. The City is not required to be a mind reader. On this record, without any requested accommodation by the plaintiff, the City had no duty to second-guess the physician's opinion that the plaintiff was medically unqualified for the position. The physician, in turn, is not liable for providing her independent medical opinion or for aiding and abetting without proof the City intentionally discriminated against the plaintiff. We therefore affirm the summary judgment.

## I. Background Facts and Proceedings.

Nolan Deeds had served as a volunteer firefighter for the City of Coralville since August 2009. Deeds first experienced symptoms of MS in December 2011. He was deer hunting when he felt numbness in his right hand. The numbness spread to his right foot and then to his entire right side. On December 14, Deeds sought treatment at Mercy Urgent Care where he reported the numbness made it "difficult to rise from bed in [the] morning" and made him "feel[] weak and unsteady on [his] right when walking." Deeds was referred for an MRI and was examined by Dr. Richard Neiman, a neurologist with Neurological Associates of Iowa City. On December 22, Dr. Neiman gave a probable diagnosis of MS. Deeds received treatment, and his symptoms cleared up by late February 2012.

After Deeds was diagnosed with MS, Dr. Neiman released him to return to "full activity for the Coralville Fire Department." The City of Coralville, however, retained Dr. Patrick Hartley to evaluate Deeds to

determine if he was fit for duty. Dr. Hartley was "not comfortable clearing [Deeds] to resume unrestricted duties as a firefighter." The Coralville Fire Department declined to allow Deeds to return to volunteer firefighting based on Dr. Hartley's evaluation. Deeds did not challenge Coralville's decision to disqualify him from its firefighting position.

In March 2012, Deeds applied for a position as a professional firefighter with the City of Marion. At the time, he was certified as a Firefighter I and II and an EMT-B (basic). Deeds was also taking classes and completing other requirements to obtain a paramedic certification, which he achieved in 2013. Deeds passed the written civil service commission test required for the position. Deeds also passed the physical agility test. In April, Deeds interviewed with Fire Chief Terry Jackson (who has since retired) and Assistant Fire Chief Deb Krebill (who is now the Marion fire chief). The interview went well, and Deeds was placed on a list of approved candidates.

In July, Deeds applied for a firefighter position with the City of Cedar Rapids. Deeds was interviewed by members of the Cedar Rapids Fire Department and the City's civil service commission in the fall of 2012 but did not receive a job offer. He was placed on the certified list of eligible candidates for the Cedar Rapids firefighter position for one year.

Deeds experienced numbness in his right foot again in December 2012 and January 2013. A clinic note by Dr. Pedro Gonzalez-Alegre set forth Deeds's description of his symptoms:

> One month ago, patient noted right foot numbness. In the course of 2-3 days, it spread to involve his left foot as well. The numbness then began to involve both legs and the back of both thighs. Over the course of the last week to week and a half, patient notes that his gait has worsened. Specifically, he notices that he wobbles when he walks.

Deeds's symptoms resolved by early February. Deeds had no MS symptoms since then, and in April of that year, he sought a second opinion from Dr. E. Tourage Shivapour, who diagnosed Deeds with relapse and remitting MS. He was prescribed different medication, which he has taken since spring 2013 without side effects.

In July, the Cedar Rapids Fire Department invited Deeds and others on the City's certified list to interview for newly opened firefighter positions. Deeds completed another interview and received a conditional offer of employment on July 25 "contingent upon satisfactory completion of a medical screening."

Deeds then completed a health screening with Jennifer Motroni, an occupational health nurse for the City of Cedar Rapids. Motroni conducted some medical tests, and Deeds completed the Municipal Fire and Police Retirement System of Iowa (MFPRSI) medical history questionnaire.[1] Deeds informed Motroni that he had been diagnosed with MS, and Motroni reached out to Dr. Shivapour with specific questions about how Deeds's MS diagnosis could affect his performance as a firefighter. In response, Dr. Shivapour completed a "Physician's Report to Employer," in which he indicated that Deeds could work with no restrictions.

---

[1]Iowa law requires the MFPRSI to set standards for "entrance examinations." Iowa Code § 400.8(1) (2014) ("The physical examination of applicants for appointment to the positions of police officer, police matron, or fire fighter shall be held in accordance with medical protocols established by the board of trustees of the fire and police retirement system established by section 411.5 and shall be conducted in accordance with the directives of the board of trustees."). One purpose of the MFPRSI is to "[p]rovide a comprehensive disability program for police officers and fire fighters to include standards for entrance physical examinations, guidelines for ongoing fitness and wellness, disability pensions, and postdisability retirement compliance requirements." *Id.* § 411.1A(2).

Dr. Jeffrey Westpheling, a St. Luke's Work Well Solutions (Work Well) physician, conducted a physical exam of Deeds on September 4 to determine if Deeds was medically qualified to work as a firefighter for Cedar Rapids. During the examination, Deeds and Dr. Westpheling discussed Deeds's MS diagnosis, the nature of his symptoms, and the dates when Deeds experienced those symptoms. Dr. Westpheling asked him to provide medical records from his neurologists; Deeds complied.

Before attending medical school, Dr. Westpheling had worked as a Des Moines firefighter for over five years and was thereby familiar with the essential job functions of a firefighter. Dr. Westpheling consulted the 2013 edition of the National Fire Protection Association (NFPA) 1582, "Standard on Comprehensive Occupational Medical Program for Fire Departments." Dr. Westpheling explained why he consulted that standard:

> In cases where there is [a] question on whether or not an applicant can perform the essential duties of [a] firefighter, the first standard to look at is the MFPRSI guidelines as set forth in the protocol. If it's not something that's expressed in the protocol, then one has to go to the next best available guidance, and in this case it would be the NFPA 1582 which is a consensus opinion of expert panels including fire chiefs, fire service members, physicians, [and] specialists in the areas of recommendations. That in my mind is the next best available source to look at, and so that's why I consulted the NFPA 1582 and have done so numerous times in the past and since. It's continually updated with new findings and new recommendations as well.

NFPA 1582 labels "[m]ultiple sclerosis with activity or evidence of progression within previous 3 years" as a "Category A" medical condition that "preclude[s] a person from performing as a member in a training or emergency operational environment by presenting a significant risk to the safety and health of the person or others." Nat'l Fire Prot. Ass'n, *NFPA 1582 Standard on Comprehensive Occupational Medical Program for*

*Fire Departments* §§ 3.3.13.1, 6.17.1 (2013 ed.). Based on Deeds's history of MS symptoms, Dr. Westpheling's personal experience working as a firefighter, and the applicable NFPA Standards, Dr. Westpheling concluded that Deeds was not medically qualified to work as a firefighter for the City of Cedar Rapids.

Motroni received a facsimile from Work Well indicating Deeds was disqualified; the facsimile included a notation that Dr. Westpheling "cannot specify [a] reason [for disqualification,] as it is considered personal."[2] Motroni notified the Cedar Rapids Fire Department that Deeds had been medically disqualified.

On September 10, Dr. Westpheling spoke with Deeds by phone. He explained the medical opinion he gave the City of Cedar Rapids and also suggested to Deeds that he could seek a second opinion regarding his ability to work as a firefighter. Deeds did not do so.

After the City of Cedar Rapids received Dr. Westpheling's medical opinion, Assistant Fire Chief Curtis Hopper called Deeds to revoke the offer of employment. Deeds did not request any accommodation for his MS from the City of Cedar Rapids.

---

[2]Dr. Westpheling did not state the reasons for the disqualification despite having an "Authorization for Release of Medical Information" that expressly allowed "St. Luke's or St. Luke's Work Well to release medical information to the City of Cedar Rapids for treatment dates from 09/04/2013 for the purpose of Employment related screening or health care." This is consistent with Dr. Westpheling's practice of not sharing a patient's information with a prospective employer because

> prospective employers don't need information on diagnoses. They only need information on whether or not that person can do the essential functions of the job applying for or not.

> The actual reason for that is not — is not pertinent or shouldn't be pertinent to their decision. So I will often tell someone they're free to discuss whatever they choose with the prospective employer, but I as an examiner am very hesitant to release that information unless I know expressly that the prospective employee is allowing me to do that.

Later that fall, another firefighter position opened with the City of Marion. Deeds again interviewed with Chief Jackson and Assistant Chief Krebill, who both concluded Deeds performed very well in his interview. Neither observed signs of any disability during the interview, and they did not ask Deeds about any medical conditions or physical disabilities, nor did Deeds disclose his MS.

On November 13, Chief Jackson tentatively offered Deeds the firefighter position, stating the offer would "be formalized once [Deeds's] physical paperwork indicating job readiness has been received by this office and all back-grounding has been completed." Deeds scheduled an appointment with Dr. Ann McKinstry at Work Well. Dr. McKinstry is a licensed medical doctor who is board certified in family medicine. She had on-the-job training for occupational medicine and making reasonable accommodations for disabilities. Dr. McKinstry had performed fewer than ten preemployment firefighter medical examinations for the Cities of Marion and Cedar Rapids. She examined Deeds on November 21 and learned he had been diagnosed with MS and had experienced symptoms within the past year.

Dr. McKinstry consulted with Dr. Westpheling, who had performed over fifty preemployment firefighter examinations.[3] Dr. Westpheling directed Dr. McKinstry to the NFPA Standards binder in the clinic. Dr. McKinstry read the NFPA 1582 chapter on "Medical Evaluations of Candidates" and reviewed Dr. Shivapour's records regarding Deeds's diagnosis, treatment, and course of disease.

---

[3]Dr. Westpheling stated in his deposition that this conversation occurred after Dr. McKinstry already evaluated Deeds. He believed that Dr. McKinstry had already completed the decision process when the conversation took place. Dr. McKinstry, however, asserted their conversation occurred during her evaluation of Deeds.

Dr. McKinstry completed the MFPRSI medical examination form, indicating that Deeds was "NOT medically qualified to do the essential functions of the job." While the form requested the physician to comment on reasons why an examinee is not qualified, Dr. McKinstry left that part blank. Chief Jackson received the form via facsimile on November 21. No one from Work Well offered additional information about why Deeds did not qualify for the position. Chief Jackson testified that he did not ask for such information because he did not have a medical release from Deeds. There is no evidence that Chief Jackson knew why Deeds was disqualified or that Deeds had MS.

Chief Jackson called Deeds and informed him that he "was not fit for duty according to the physicians." During this phone call, Chief Jackson did not ask Deeds why he was disqualified, and Deeds did not tell Chief Jackson that he had MS or that other physicians found him fit for firefighting. Deeds did not ask for any accommodation or second opinion. Nor did Deeds ask Dr. McKinstry to change her opinion. Chief Jackson followed up on his phone call with a letter to Deeds revoking the conditional employment offer.

In January 2014, Deeds filed a complaint with the ICRC, alleging that the City of Marion discriminated against him based on his disability. It was only after Deeds filed his ICRC complaint that the City of Marion learned that Deeds had MS. The ICRC issued Deeds an administrative release.

The next month, Deeds filed another complaint with the ICRC alleging that the City of Cedar Rapids discriminated against him on the basis of his disability. The ICRC issued Deeds an administrative release with regard to these charges as well.

An attorney for the City of Marion wrote to one of Deeds's attorneys, seeking Deeds's medical records and offering to pay for an individualized assessment of Deeds to be done if Work Well had not previously conducted such an assessment. The City also offered to engage in an interactive process, informing Deeds's attorney that

> [i]f the Work Well Clinic file establishes Mr. Deeds underwent an individualized physical assessment and can perform the essential job functions without reasonable accommodation, then we agree that Mr. Deeds should be hired and we acknowledge the necessity of resolving any back pay due and owing.
>
> If the Work Well Clinic file establishes that Mr. Deeds underwent an individualized physical assessment and may be able to perform the essential job functions of firefighter with some accommodation, then we must determine the reasonableness of any accommodations requested before we can take any further steps in this process.

The City's attorney also noted that Deeds "is the only person who has access to the information necessary to determine whether he can perform the essential job functions of a firefighter." Deeds's attorney responded,

> Once I receive confirmation from the Iowa Civil Rights Commission that the City of Marion has substantively responded to Mr. Deed's Complaint, I will be happy to provide you with a copy of his medical records from St. Luke's Work Well Clinic.

The City submitted its substantive response to the complaint, but Deeds's attorney nevertheless failed to provide the promised medical records to the City. Moreover, Deeds did not agree to engage in the interactive process to explore reasonable accommodations, as offered by the City.

Deeds instead filed separate civil lawsuits against the City of Marion and the City of Cedar Rapids on January 30, 2015. Deeds alleged that Marion and Cedar Rapids discriminated against him based on his disability in violation of Iowa Code section 216.6(1)(*a*) (2014). In

both lawsuits, Deeds alleged that Well Work, St. Luke's Healthcare, and Iowa Health System (collectively, the UnityPoint defendants) aided and abetted the discrimination.

In Deeds's suit against the City of Marion, the City filed an answer, and the UnityPoint defendants filed a motion to dismiss. The motion to dismiss was denied, and the UnityPoint defendants filed their answer. The City and the UnityPoint defendants moved for summary judgment. Deeds resisted the motions. The district court granted both motions for summary judgment. The district court concluded that Deeds failed to show a genuine issue of material fact exists as to whether the City took adverse action because of Deeds's disability. The district court concluded *Sahai v. Davies*, 557 N.W.2d 898 (Iowa 1997) (en banc), controlled Deeds's claim against the UnityPoint defendants for aiding and abetting. The court found "[t]he evidence in the record overwhelming[ly] demonstrates that Dr. McKinstry played an advisory role to the City of Marion and rendered an independent medical judgment on Mr. Deeds' physical qualification."

Deeds's lawsuit against the City of Cedar Rapids took a similar course. The City filed an answer, and the UnityPoint defendants filed a motion to dismiss that was denied. The UnityPoint defendants then filed their answer and the City and the UnityPoint defendants moved for summary judgment. Deeds resisted the motions. The district court granted both motions for summary judgment on the same grounds as the City of Marion decision.

Deeds appealed the judgments in both cases, and we transferred them to the court of appeals. The court of appeals affirmed the summary judgment in both cases. The court of appeals determined that Deeds "failed to show the City rescinded its job offer based on his MS

diagnosis." The court of appeals also concluded that "[b]ecause Deeds has failed to show the City engaged in a discriminatory employment practice, his claim that UnityPoint aided or abetted in the discriminatory employment practice necessarily fails." Deeds applied for further review, which we granted.

## II. Standard of Review.

We review summary judgment rulings for correction of errors at law. *Goodpaster v. Schwan's Home Serv., Inc.*, 849 N.W.2d 1, 6 (Iowa 2014). "Summary judgment is proper when the movant establishes there is no genuine issue of material fact and it is entitled to judgment as a matter of law." *Id.* We view the record in the light most favorable to the nonmoving party. *Id.*

## III. Analysis.

The ICRA prohibits an employer from discriminating against an applicant for employment based on disability. *See* Iowa Code § 216.6(1). In *Goodpaster*, we held that MS can be a disability under the ICRA "if the plaintiff produces evidence that the condition substantially impaired one or more major life activities during episodes or flare-ups, even if it did not impair life activities at all when in remission." 849 N.W.2d at 13. In that case, the employer was aware of the employee's MS. *Id.* at 5. Here, the fighting issue is whether the City can be liable for discriminating against an applicant with MS when the City was unaware he had MS. The ICRA provides,

> It shall be an unfair or discriminatory practice for any:
>
> *a.* Person to refuse to hire . . . or to otherwise discriminate in employment against any applicant for employment or any employee *because of* the . . . disability of such applicant or employee, unless based upon the nature of the occupation. If a person with a disability is qualified to perform a particular occupation, by reason of training or experience, the nature of that occupation shall not be the

basis for exception to the unfair or discriminating practices prohibited by this subsection.

Iowa Code § 216.6(1) (emphasis added). In order to establish a prima facie case of disability discrimination, a plaintiff must show "(1) he or she is a disabled person; (2) he or she is qualified to perform the job, with or without an accommodation; and (3) he or she suffered an adverse employment decision because of the disability." *Casey's Gen. Stores, Inc. v. Blackford*, 661 N.W.2d 515, 519 (Iowa 2003); *see also Goodpaster*, 849 N.W.2d at 6 (requiring plaintiff to prove "the circumstances of his termination raise an inference of illegal discrimination"). The ICRA also provides that it is a discriminatory practice for "[a]ny person to intentionally aid, abet, compel, or coerce another person to engage in any of the practices declared unfair or discriminatory by this chapter." Iowa Code § 216.11(1).

**A. Discrimination Claim Against the City.** We must decide whether the district court correctly entered summary judgment for the City on grounds that Deeds could not show it declined to hire him *because of* his MS. When the City rescinded its job offer to Deeds, the City did not know he had MS. The City only knew that the physician reported Deeds was not medically qualified for the firefighter position. Deeds, however, knew the physician found him unqualified because of his MS and could have told the City he had that condition and requested an accommodation but failed to do so. Deeds also failed to engage in the interactive process offered by the City after his ICRA complaint to explore reasonable accommodations. We conclude that Deeds cannot show the City discriminated against him "because of" his disability.

1. *The City had no duty to inquire further when Deeds failed to request an accommodation.* Deeds argues the City was required to look

behind the medical opinion of Dr. McKinstry. The fire chief testified he had no idea why Dr. McKinstry found Deeds unfit for the job. Deeds, on the other hand, knew Dr. McKinstry concluded he was not qualified because of his MS. Yet he made no effort to challenge her opinion, ask her to reconsider, request any accommodation from the City, or tell the fire chief that another physician had found him qualified. Employers generally are entitled to rely on a physician's opinion that the employee or prospective employee is medically unqualified for the job. *See Faidley v. United Parcel Serv. of Am., Inc.*, 889 F.3d 933, 942 (8th Cir. 2018) (en banc) (affirming summary judgment dismissing Americans with Disabilities Act (ADA) claim and stating that "[t]he ADA does not require an employer to permit an employee to perform a job function that the employee's physician has forbidden" (alteration in original) (quoting *Scruggs v. Pulaski County*, 817 F.3d 1087, 1094 (8th Cir. 2016) (affirming summary judgment for employer))); *Alexander v. Northland Inn*, 321 F.3d 723, 727 (8th Cir. 2003) (affirming summary judgment dismissing ADA claim and acknowledging that "Northland was entitled to rely and act upon the written advice from Alexander's physician . . . . [because i]n this situation, the employee's belief or opinion that she can do the function is simply irrelevant"); *Crocker v. Runyon*, 207 F.3d 314, 317–18 (6th Cir. 2000) (affirming summary judgment dismissing disability discrimination claim because the plaintiff, who failed the preemployment physical conducted by a physician under contract to perform such examinations for the employer, "failed to offer medical evidence contemporaneous with his nonhiring to contradict the evidence upon which the [employer] relied").

On this record, we decline to impose a duty on the City to second-guess Dr. McKinstry's independent medical opinion that Deeds was

unqualified for the firefighter position.  *See Howard v. Steris Corp.*, 886 F. Supp. 2d 1279, 1293 (M.D. Ala. 2012) ("[I]t would make little sense to put the burden on the party with relatively less knowledge about the possible disability (the employer with some inkling that the employee has a health problem) instead of on the party with relatively more knowledge about it (the employee who is actually experiencing the symptoms, knows his medical history, and has firsthand knowledge about how it affects his job performance)."); *cf. Action Indus., Inc. v. Commonwealth*, 518 A.2d 610, 613 (Pa. Commw. Ct. 1986) (addressing an applicant's pretext challenge to the employer's defense of reasonable reliance on a medical opinion and explaining that "a complainant who presents medical evidence favorable to him which evidence was *unknown to the employer at the time of the refusal to hire* does not negate an employer's showing of a non-pretextual reason for refusing to hire an employee it perceived as . . . disabled, where the employer has demonstrated that it reasonably relied upon the advice of a medical expert in forming its perception and, for that reason alone, rejected the candidate" (emphasis added)).

The Iowa Administrative Code requires employers to "make reasonable accommodation to the *known* physical or mental limitations of an otherwise qualified handicapped applicant . . . unless the employer can demonstrate that the accommodation would impose an undue hardship on the operation of its program."  Iowa Admin. Code r. 161—8.27(6) (emphasis added).

> [T]he employee can't expect the employer to read his mind and know he secretly wanted a particular accommodation and sue the employer for not providing it.  Nor is an employer ordinarily liable for failing to accommodate a disability of which it had no knowledge.

*Schmidt v. Safeway, Inc.*, 864 F. Supp. 991, 997 (D. Or. 1994); *see also Hedberg v. Ind. Bell Tel. Co.*, 47 F.3d 928, 934 (7th Cir. 1995) ("The ADA does not require clairvoyance."). The onus was on Deeds to request an accommodation, not on the City to inquire further about Deeds's disqualification. *See Magnussen v. Casey's Mktg. Co.*, 787 F. Supp. 2d 929, 956 (N.D. Iowa 2011) ("If an employee fails to make a request for accommodation, then his employer has no duty to accommodate." (quoting *Buboltz v. Residential Advantages, Inc.*, 523 F.3d 864, 870 (8th Cir. 2008), *abrogated on other grounds by Torgerson v. City of Rochester*, 643 F.3d 1031, 1043 (8th Cir. 2011))); *see also Featherstone v. S. Cal. Permanente Med. Grp.*, 217 Cal. Rptr. 3d 258, 273 (Ct. App. 2017) (noting that the employee who wants an accommodation bears the burden of giving the employer notice of the disability and emphasizing that an employer "has no affirmative duty to investigate whether an employee's illness might qualify as a disability").

As the United States Court of Appeals for the Seventh Circuit noted,

> [a]n employee has the initial duty to inform the employer of a disability before ADA liability may be triggered for failure to provide accommodations—a duty dictated by common sense lest a disabled employee keep his disability a secret and sue later for failure to accommodate.

*Beck v. Univ. of Wis. Bd. of Regents*, 75 F.3d 1130, 1134 (7th Cir. 1996). Deeds breached this duty to inform his prospective municipal employers of his MS and did what the Seventh Circuit warned is impermissible—he kept his disability a secret and then sued both cities for failing to accommodate his MS.

It is well established that the employee or applicant bears the burden of informing the employer of his or her disability. *See Taylor v.*

*Principal Fin. Grp., Inc.*, 93 F.3d 155, 165 (5th Cir. 1996) (noting "it is the responsibility of the individual with the disability to inform the employer than an accommodation is needed" (quoting 29 C.F.R. pt. 1630, app. § 1630.9 (1995))); *see also Lockard v. Gen. Motors Corp.*, 52 F. App'x 782, 788 (6th Cir. 2002) (concluding employee "never triggered [the employer's duty to engage in the interactive process] because of her failure to request a reasonable accommodation in the first place"); *Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 313 (3d Cir. 1999) (explaining that "[w]hat matters under the ADA . . . [is] whether *the employee . . . provides the employer with enough information* that, under the circumstances, the employer can be fairly said to know of both the disability and desire for an accommodation" (emphasis added)); *Loulseged v. Akzo Nobel Inc.*, 178 F.3d 731, 735 n.4 (5th Cir. 1999) (recognizing that "the burden is on the employee to request an accommodation" because "[e]mployers cannot be expected to anticipate all the problems that a disability may create on the job and spontaneously accommodate them"); *Hunt-Golliday v. Metro. Water Reclamation Dist. of Greater Chi.*, 104 F.3d 1004, 1013 (7th Cir. 1997) (rejecting failure-to-accommodate claim because the employee "failed to present anything at all regarding whether she informed [her employer] of her alleged mental disability and her need for an accommodation").

In *Avila v. Continental Airlines, Inc.*, an employee missed several days of work when he was hospitalized for acute pancreatitis. 82 Cal. Rptr. 3d 440, 446 (Ct. App. 2008). While the employee had provided the employer with documentation showing that he had been hospitalized, neither document "contained diagnostic or other information to indicate the nature of [his] illness or injury." *Id.* at 449. The employee missed additional days of work and was fired for absenteeism. *Id.* at 446–47.

The employee sued his former employer for failing to accommodate his disability as required by the California Fair Employment and Housing Act. *Id.* at 447. The *Avila* court explained that an "employee bears the burden of giving the employer notice of his or her disability." *Id.* at 453. Specifically, the court emphasized that "[t]he employee can't expect the employer to read his mind and know he secretly wanted a particular accommodation and sue the employer for not providing it." *Id.* (alteration in original) (quoting *Prilliman v. United Air Lines, Inc.*, 62 Cal. Rptr. 2d 142, 152 (Ct. App. 1997)). The court concluded that the documentation provided by the employee was insufficient to put the employer on notice that the employee was disabled. *Id.* Additionally, evidence that the employee "called in sick"—without additional information about what was said during the call—was "inadequate to support a conclusion that [the employee] informed [the employer] of his disability or the physical limitations it caused, such that [the employer] was on notice that [the employee] required accommodation." *Id.* The court affirmed summary judgment on the employee's failure-to-accommodate claim. *Id.*

We conclude that the City did not have a legal duty to investigate after receiving the medical opinion Deeds was not qualified for the position, when Deeds himself remained silent regarding his medical disqualification and requested no accommodation. The burden was on Deeds to give the City notice of his disability; after all, Deeds knew his MS was the physician's reason for his disqualification. Yet Deeds kept his disability a secret when talking to Chief Jackson on the phone. The City was not required to read Deeds's mind, and the City was never told another physician had cleared Deeds to work as a firefighter with no restrictions.

Deeds relies on dicta in *Sahai* to argue "that an employer's failure to ask follow-up questions concerning a physician's finding that an employee could not perform the essential functions of a job might violate 'employment discrimination laws.'" Dr. Sahai concluded that Davies should not be hired for an assembly-line job because she was fourteen weeks pregnant. 557 N.W.2d at 902 (plurality opinion). Dr. Sahai phoned a representative of Nissen, the employer, and "informed him that he did not believe a young woman who was fourteen weeks pregnant should be doing assembly line work." *Id.* We noted,

> At this point, Nissen representatives were free to ask follow-up questions concerning whether Dr. Sahai's recommendation was based on his beliefs concerning Davies' ability to perform assembly line work or upon potential physical harm to her from doing that work. The fact that Nissen did not ask these follow-up questions and, as a result, *might have violated employment discrimination laws*, does not make Dr. Sahai's recommendation, based on health considerations, a sexually discriminatory act.

*Id.* (emphasis added).

But in *Sahai,* the doctor specifically told the employer the applicant was unqualified because of her pregnancy, which supported a finding the employer declined to hire Davies because of her disability (pregnancy).[4] *See id.* By contrast, Dr. McKinstry did not tell the City that Deeds had MS. Instead, she simply informed the City that Deeds was "NOT medically qualified to do the essential functions of the job."

As the district court correctly concluded,

> If, under this set of facts, the City must ask applicants about their understanding as to why they were not cleared by the doctor, the City exposes itself to potential liability for perceived disability discrimination in every case. This

---

[4]The employer's liability was not at issue in *Sahai*, so we did not decide whether the employer violated the ICRA. *See* 557 N.W.2d at 900.

> potential liability would arise even when the employee is not disabled as a matter of law.
>
> Thus, the employee should be required to raise the issue. In this case, Mr. Deeds, who knew why he had not been medically cleared to perform the job, can question the employer's decision either when he is first informed of the decision or at some point thereafter. If the employee does raise the issue, the employer's obligation to consider reasonable accommodations is then triggered. Mr. Deeds did not raise the issue until he filed his civil rights claim.

It makes sense for cities to decline to hire employees found medically unfit for a position requiring dangerous and physically demanding emergency rescues. Indeed, a city that hires a firefighter found to be medically unqualified for the position faces liability for resulting injuries. Iowa recognizes tort liability for negligent hiring or retention of unfit employees. *See Godar v. Edwards*, 588 N.W.2d 701, 709 (Iowa 1999) (recognizing a cause of action for negligent hiring and "conclud[ing] that an employer has a duty to exercise reasonable care in hiring individuals, who, because of their employment, may pose a threat of injury to members of the public"). Additionally, cities are liable for a firefighter's on-the-job injuries. *See* Iowa Code § 411.15 ("Cities shall provide hospital, nursing, and medical attention for the members of the police and fire departments . . . when injured while in the performance of their duties as members of such department . . . ."). We will not require cities to challenge an independent medical opinion that an applicant for a firefighting position is unqualified when the applicant himself did not ask the city to do so or seek any accommodation.

2. *Deeds caused a breakdown in the interactive process offered by the City.* The City offered to engage in an interactive process after it learned from Deeds's ICRC complaint that he had MS. Deeds filed suit instead of accepting the City's offer to explore possible reasonable accommodations through this interactive process. In *Casey's General*

*Stores*, we recognized the need for an employer and employee to engage in the interactive process to determine a reasonable accommodation. *See* 661 N.W.2d at 521. Similarly, federal regulations implementing the ADA recognize that "[t]he appropriate reasonable accommodation is best determined through a flexible, interactive process that involves both the employer and the [employee] with a disability." *Beck*, 75 F.3d at 1135 (alteration in original) (quoting 29 C.F.R. pt. 1630, app. § 1630.9). The *Beck* court recognized that when

> the missing information is of the type that can only be provided by one of the parties, failure to provide the information may be the cause of the breakdown and the party withholding the information may be found to have obstructed the process.

*Id.* at 1136. "[N]either party should be able to cause a breakdown in the process for the purpose of either avoiding or inflicting liability." *Id.* at 1135.

The City sought to commence the interactive process by requesting Deeds's medical results and offering to pay for an individualized assessment of Deeds to be done if such assessment had not been conducted already by UnityPoint. Deeds initially refused to provide the requested medical information or participate in the retesting offered by the City, demanding that it first respond to his ICRC complaint.[5] Then after the City filed its response to the ICRC complaint, Deeds filed this civil lawsuit against the City instead of engaging in the interactive process. We conclude Deeds caused the breakdown in the interactive process, which provides another basis for affirming the summary judgment against him.

---

[5]In oral arguments, Deeds's attorney emphasized that the City only offered retesting *after* it denied Deeds employment. But as we discuss below, the City did not know Deeds had MS until he filed his ICRC complaint.

Other courts have granted or affirmed summary judgment for the employer when the employee claiming disability discrimination refused to provide the necessary information to move forward with the interactive process. *See, e.g., EEOC v. Kohl's Dep't Stores, Inc.*, 774 F.3d 127, 130–34 (1st Cir. 2014) (concluding that employee was "primarily responsible for the breakdown in the interactive process" when the employee walked out of a meeting after employer stated it could not provide the specific accommodation the employee requested and the employee later refused to discuss other potential accommodations); *Kratzer v. Rockwell Collins, Inc.*, 398 F.3d 1040, 1045 (8th Cir. 2005) (concluding that employee caused the breakdown in the interactive process when she failed to obtain the updated physical evaluation as promised so the employer could determine what accommodation was needed); *Templeton v. Neodata Servs., Inc.*, 162 F.3d 617, 618–19 (10th Cir. 1998) (concluding employee failed to establish an ADA violation when she refused to authorize her physician to release information requested by the employer to determine reasonable accommodations); *Steffes v. Stepan Co.*, 144 F.3d 1070, 1072–73 (7th Cir. 1998) (concluding employee who "had it within her power to explain the nature of the job to her doctor and to obtain a more comprehensive release letter" as requested by her employer failed to do so and therefore "failed to hold up her end of the interactive process by clarifying the extent of her medical restrictions"); *Gerdes v. Swift-Eckrich, Inc.*, 949 F. Supp. 1386, 1406 (N.D. Iowa 1996) (acknowledging that "the missing information was of the type that could only be provided" by the employee or his physician and noting that the employee, "his attorney, and his physician were not forthcoming with the information even though [the employer] may have exceeded its obligations by making frequent requests for clarification"). Summary judgment is proper on

this record because Deeds failed to do his part to move forward with the interactive process. This is unfortunate because Deeds missed the opportunity to determine whether he could have worked as a firefighter with reasonable accommodations.

3. *The City's knowledge that Deeds was "not medically qualified" is insufficient to raise a jury question of whether it discriminated against him "because of" his disability.* We next consider what knowledge is sufficient to find an employer discriminated against an applicant "because of" the applicant's disability. It is undisputed that the City was told by the examining physician that Deeds was not medically qualified for the firefighter position without explanation or disclosure of his MS. And it is undisputed the fire chief who made the decision to reject his application was unaware Deeds had MS. Deeds himself never disclosed his MS to the City, nor did he request a second medical opinion or any accommodation when told his application was declined because of the physician's report that he was not medically qualified. As the United States Supreme Court noted,

> If [the decision-maker] were truly unaware that . . . a disability existed, it would be impossible for [the] hiring decision to have been based, even in part, on [the applicant's] disability. And, if no part of the hiring decision turned on [the applicant's] status as disabled, he cannot, *ipso facto*, have been subject to disparate treatment.

*Raytheon Co. v. Hernandez*, 540 U.S. 44, 54 n.7, 124 S. Ct. 513, 520 n.7 (2003). We reach the same conclusion.

Numerous other courts have held that a disability discrimination claim fails when the employer is unaware of the plaintiff's disability. *See, e.g., Cordoba v. Dillard's, Inc.*, 419 F.3d 1169, 1183 (11th Cir. 2005) ("[The store manager] could not have fired [the employee] 'because of' a disability that she knew nothing about."); *Taylor*, 93 F.3d at 163 ("To

prove discrimination, an employee must show that the employer knew of such employee's substantial physical or mental limitation."); *Hedberg*, 47 F.3d at 933 n.5 ("[W]here there is no genuine issue that an employer did not know of an employee's disability when it decided to fire him, the employee cannot make out a case of discriminatory discharge."); *Streeter v. Premier Servs., Inc.*, 9 F. Supp. 3d 972, 979 (N.D. Iowa 2014) ("[The employer] focuses on the third prong [of the *prima facie* case of disability discrimination] and points out that there is no evidence that it knew of [the employee's] alleged disability.  In light of this lack of knowledge, [the employer] argues that [the employee] cannot prove he suffered an adverse employment action *because of* his disability.  [The employer] is correct."); *Brundage v. Hahn,* 66 Cal. Rptr. 2d 830, 836 (Ct. App. 1997) ("An adverse employment decision cannot be made 'because of' a disability, when the disability is not known to the employer.  Thus, in order to prove an ADA claim, a plaintiff must prove the employer had knowledge of the employee's disability when the adverse employment decision was made.").

The United States Court of Appeals for the Eleventh Circuit has held that *constructive knowledge* is insufficient to support a finding that the employer discriminated against an employee "because of" a disability. *Cordoba*, 419 F.3d at 1185 (dismissing as dicta statements in previous cases that a plaintiff must show the employer "had actual or constructive knowledge" of the disability).  In *Cordoba*, the employee argued her employer had constructive knowledge of the alleged disability because employees other than the employee who decided to fire her

(1) were aware of her condition and scheduled surgery,
(2) had observed her experiencing heart palpitations,
(3) knew that she had left work and gone to the emergency

room once because of heart palpitations, and (4) had accommodated her request for a reduction in hours.

*Id.* at 1183. The court observed, "As a matter of logic, [the decision-maker] could not have fired [the employee] 'because of' a disability that she knew nothing about." *Id.*

Deeds argues that Dr. McKinstry's finding he was medically unqualified for the firefighting position put the City on notice that he had a disability. We disagree. "While knowledge of the disability can be inferred from the circumstances, knowledge will only be imputed to the employer when the fact of disability is the *only reasonable interpretation* of the known facts." *Brundage*, 66 Cal. Rptr. 2d at 836 (emphasis added). Persons may fail the medical examination required to be a professional firefighter for many reasons that do not constitute a disability within the meaning of the ICRA. *See* Iowa Code § 216.2(5) (defining "[d]isability" as "the physical or mental condition of a person which constitutes a substantial disability"); *Goodpaster*, 849 N.W.2d at 6–13 (discussing criteria for defining a protected "disability" under the ICRA).[6] Emergency firefighting is a physically demanding occupation.

---

[6]The following administrative rules elaborate on the meaning of disability under the ICRA:

**8.26(1)** The term "substantially handicapped person" shall mean any person who has a physical or mental impairment which substantially limits one or more major life activities, has a record of such an impairment, or is regarded as having such an impairment.

**8.26(2)** The term "physical or mental impairment" means:

*a.* Any physiological disorder or condition, cosmetic disfigurement, or anatomical loss affecting one or more of the following body systems: neurological; musculoskeletal; special sense organs; respiratory, including speech organs; cardiovascular; reproductive; digestive; genito-urinary; hemic and lymphatic; skin; and endocrine; or

*b.* Any mental or psychological disorder, such as mental retardation, organic brain syndrome, emotional or mental illness, and specific learning disabilities.

Applicants who fail the medical examination for a firefighting position do not necessarily have a condition that substantially impairs a major life activity. Indeed, courts have recognized a variety of conditions may disqualify an applicant from a firefighter position without constituting a protected disability. *See, e.g., Bridges v. City of Bossier*, 92 F.3d 329, 331–35 (5th Cir. 1996) (concluding that person disqualified from holding jobs, such as firefighting, "involving routine exposure to extreme trauma" due to blood clotting disorder (a mild form of hemophilia) is not disabled under the ADA because that condition is not "a substantial limitation on the major life activity of working"); *Welsh v. City of Tulsa*, 977 F.2d 1415, 1417–19 (10th Cir. 1992) (stating "[d]iminished sensory perception in two fingers simply is not an impairment that satisfies the test for handicap under the [Rehabilitation] Act" and affirming summary judgment for city, concluding "that denial of a single job in a single field due to a physical condition does not establish that a person is perceived as having an impairment that substantially limits a major life activity"); *Serrano v. County of Arlington*, 986 F. Supp. 992, 995–97 (E.D. Va. 1997) (acknowledging that applicant's history of back problems—herniated discs and spinal stenosis—led to disqualification from firefighting position and recognizing "[t]he inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working" (quoting 29 C.F.R. § 1630.2(j)(3)(i) (1997))); *City of Columbus Civil Serv. Comm'n v. McGlone*, 697 N.E.2d 204, 205–07 (Ohio 1998) (concluding nearsightedness is not a handicap under Ohio's ADA and

---

**8.26(3)** The term "major life activities" means functions such as caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working.

Iowa Admin. Code r. 161—8.26.

emphasizing that the applicant "le[d] a normal life" and "that a person denied employment because of a physical impairment is not necessarily 'handicapped' "). Thus, we are not persuaded that the physician's report that Deeds was medically unqualified for firefighting informed the City he had a disability protected under the ICRA.

Deeds relies on a federal case stating,

> An employer knows an employee has a disability when the employee tells the employer about his condition, or when the employer otherwise becomes aware of the condition, *such as through a third party* or by observation. The employer need only know the underlying facts, not the legal significance of those facts.

*Schmidt*, 864 F. Supp. at 997 (emphasis added). Deeds suggests that because Dr. McKinstry told the City that Deeds was medically disqualified, the City was aware of "the underlying facts" of Deeds's disability and therefore was not entitled to summary judgment. *Schmidt* is distinguishable. The *Schmidt* court concluded that "whether defendant knew alcohol abuse is considered a 'disability' is of no consequence here. It is sufficient that defendant knew plaintiff had an alcohol problem." *Id.*; *see also United States v. City of Denver*, 49 F. Supp. 2d 1233, 1241 (D. Colo. 1999) ("[W]hether a defendant knows that a physical impairment is considered a disability is of no consequence. It suffices if the defendant knows the physical impairment exists."). We are *not* confronting a situation in which the City knew Deeds had MS but did not know MS qualified as a disability under Iowa law. The City was unaware of his MS.

Another case relied upon by Deeds, *Adams v. Rice,* is equally inapposite. 531 F.3d 936, 954 (D.C. Cir. 2008) ("[I]f an employer discriminates against an employee *on the basis of* a physical or mental impairment, . . . and if the impairment in fact qualifies as a 'disability'

under the Act, . . . then the employer may be vulnerable to a charge of employment discrimination." (Emphasis added.)). In *Adams*, the federal government declined to offer Adams a position with the United States Foreign Service after learning that Adams previously battled breast cancer. *Id.* at 941–42. The court rejected the government's argument that

> an employer cannot be held liable for discrimination based on a record of a disability unless it knows not only about the employee's alleged history of a physical or mental impairment, but also how that impairment substantially limited a major life activity.

*Id.* at 950. The court explained its reasoning through the following hypothetical.

> Suppose a telephone receptionist takes a leave of absence from work because he's experiencing headaches only to discover that he has a malignant brain tumor. The tumor is surgically removed, rendering the employee cancer-free. As a result of the treatment, however, the employee experiences significant hearing loss. Now suppose the employer learns about the tumor—but has no idea about the hearing loss—and informs the employee he's not welcome back at work *because he had cancer*. Is that illegal discrimination under the Act? Of course it is. In such situations it makes no difference whether an employer has precise knowledge of an employee's substantial limitation; . . . it is enough for the employer to know about the impairment.

*Id.* at 953. Because the government knew about Adams's impairment—i.e., a history of breast cancer—it did not matter that the government did not know of the precise limitation caused by cancer; the government could still "be vulnerable to a charge of employment discrimination." *Id.* at 953–54. Again, it is undisputed that the City did not know Deeds had MS.

Dr. McKinstry's opinion that Deeds was not medically qualified for the firefighter position was insufficient to inform the City that Deeds had

a protected disability. *See Morisky v. Broward County,* 80 F.3d 445, 448 (11th Cir. 1996) ("Vague or conclusory statements revealing an unspecified incapacity are not sufficient to put an employer on notice of its obligations under the ADA."); *cf. Pridemore v. Rural Legal Aid Soc'y of W. Cent. Ohio,* 625 F. Supp. 1180, 1184–85 (S.D. Ohio 1985) (concluding letter to employer in which applicant explained he "was born . . . with miniscule brain damage to the perceptual and sensory-motor areas of the brain" and stated that he hoped the employer would not turn him down "in violation of the Rehabilitation Act of 1973" did not raise a genuine issue as to the employer's knowledge of the applicant's cerebral palsy). As noted, a person could be "not medically qualified" for a firefighter position without having a disability protected under the ICRA.

Deeds relies on *Boelman v. Mason State Bank,* 522 N.W.2d 73, 77 (Iowa 1994), for the proposition that "when the reason for an employee's discharge is 'causally connected to' the employee's disability, the discharge is 'because of' the employee's disability." In *Boelman,* the employee's MS led to depression and an adjustment disorder, and the employee's performance as the vice president of the bank suffered. *Id.* at 76. The employee was eventually discharged because of his poor performance, and he sued the bank for disability discrimination. *Id.* at 76–77. The district court "found that because of his MS [the employee] was mentally and emotionally unable to handle the job and therefore, he had failed to show he was qualified for the position of vice president." *Id.* at 77. The court ruled that the employee failed to establish a prima facie case of discrimination; the employee appealed. *Id.* We held that "[w]here an employer fires an employee based on conduct shown to be causally connected to the employee's disability, the termination is 'solely by reason of' the disability for purposes of section 504 [of the Federal

Rehabilitation Act]."[7] *Id.* However, because the district court's finding that the former employee failed to show he was "qualified" for the position was supported by substantial evidence, we affirmed the district court's ruling. *Id.* at 77, 82.

*Boelman* is distinguishable. The employer in that case knew the employee had MS that affected his job performance. *See id.* at 78. By contrast, there is no evidence Chief Jackson and Assistant Chief Krebill knew Deeds had MS. Deeds never told them or requested any accommodation. They did not notice any physical limitations when they interviewed Deeds. Instead, the City rescinded its offer based on the physician's medical determination that Deeds could not perform the essential functions of a firefighter. The medical report did not tell the City that Deeds had MS. On this record, the district court properly concluded as a matter of law that Deeds could not prove the City rejected his job application because of his disability.

Finally, Deeds argues Dr. McKinstry is the City's agent such that her knowledge of Deeds's MS is imputed to the City. We disagree. Dr. McKinstry is not a City employee; she and the UnityPoint defendants are independent contractors hired by the City. This is no nefarious shell game to avoid ICRA liability; Iowa municipalities the size of Marion would not ordinarily have a physician on staff as a city employee but rather routinely outsource employment physicals to medical clinics employing the doctor. Deeds made no showing of a principal–agent relationship between the City and the UnityPoint defendants. The Restatement (Third) of Agency defines "agency" as

---

[7]Section 504 prohibited discrimination against a "qualified individual" with a disability "solely by reason of" the disability. *Boelman*, 522 N.W.2d at 77 (citing 29 U.S.C. § 794 (Supp. II 1990)).

> the fiduciary relationship that arises when one person (a "principal") manifests assent to another person (an "agent") that the agent shall act on the principal's behalf and *subject to the principal's control,* and the agent manifests assent or otherwise consents so to act.

Restatement (Third) of Agency § 1.01, at 17 (Am. Law Inst. 2006) (emphasis added). There is no evidence that the City "controlled" or had a right to control *how* Dr. McKinstry performed her physical examinations; rather, she exercised her own independent medical judgment, as discussed below.[8] Chief Jackson, not Dr. McKinstry, made the decision not to hire Deeds. Courts under these circumstances have rejected claims that the physician performing the physical examination is the employer's "agent" under the ADA. *See Satterfield v. Tennessee*, 295 F.3d 611, 617–19 (6th Cir. 2002) (affirming summary judgment dismissing ADA claim and rejecting theory that physician was "agent" for employer with policy "not to employ anyone who did not pass the physical examination"); *Burnette v. Univ. of Akron*, No. 5:11cv2361, 2012 WL 3587568, at *5 (N.D. Ohio Aug. 20, 2012) (rejecting theory that physician was an "agent" for employer when there was no allegation the physician was authorized to make employment decisions on the employer's behalf). Accordingly, there is no basis to impute Dr. McKinstry's knowledge of Deeds's MS to the City under an agency theory.

---

[8]In *Garlitz v. Alpena Regional Medical Center*, the court found a question of fact whether the employer exercised sufficient control over the physician's "preemployment screening procedures" that precluded summary judgment on an agency theory under Title VII's definition of "employer." 834 F. Supp. 2d 668, 680, 683 (E.D. Mich. 2011). Such evidence of control is lacking here. Another federal trial court found the physician to be the employer's agent under Title VII in *Jimenez v. Dyncorp International, LLC*, 635 F. Supp. 2d 592, 602 (W.D. Tex. 2009). Neither *Jimenez* nor *Garlitz* relied on an agency theory under the ADA. Indeed, the *Jimenez* court specifically declined to apply Rehabilitation Act and ADA precedent to the Title VII claim because it was unclear whether "an agent of an employer under the Rehabilitation Act shares the same definition as an agent of an employer under Title VII." 635 F. Supp. 2d at 602–03 & n.9.

The district court correctly concluded that Deeds lacked evidence the City rescinded its offer *because of* Deeds's disability. Deeds argues this conclusion enables an employer to bury its head in the sand to avoid liability under the ICRA. However, we see no evidence that the City deliberately sought to avoid learning about a potentially protected disability or conspired with any physician to evade liability under the ICRA. Chief Jackson testified that he did not ask Work Well for additional information on Deeds's disqualification because he did not have a medical release. Deeds made no showing that the City has a policy of not obtaining a patient's waiver so that it can purposefully avoid asking questions about an applicant found medically unqualified.

**B. Aiding and Abetting in Discrimination Claim Against the UnityPoint Defendants.** Next, we must decide whether the district court correctly granted summary judgment for the UnityPoint defendants. Under the ICRA, it is a discriminatory practice for "[a]ny person to intentionally aid, abet, compel, or coerce another person to engage in any of the practices declared unfair or discriminatory by this chapter." Iowa Code § 216.11(1). We conclude that Deeds's aiding-and-abetting claim fails for two reasons. First, as we explained above, Deeds failed to show the City violated the ICRA. An aiding-and-abetting claim fails without an actionable wrong that was aided.[9] Second, Dr. McKinstry exercised her independent medical judgment in advising the City that Deeds was medically unqualified. Her conduct is not actionable under *Sahai.*

---

[9]The district court did not reach this ground, but we may affirm summary judgment on an alternative ground supported by the record and urged by the movant in district court and on appeal. *Veatch v. City of Waverly*, 858 N.W.2d 1, 7 (Iowa 2015).

We agree with the court of appeals that a plaintiff must first establish the employer's participation in a discriminatory practice before a third party can be found liable for aiding and abetting. *See, e.g.*, *Stoddard v. BE & K, Inc.*, 993 F. Supp. 2d 991, 1007 (S.D. Iowa 2014) (concluding aiding-and-abetting claim necessarily fails if the underlying discrimination claim fails); *Pellegrini v. Sovereign Hotels, Inc.*, 740 F. Supp. 2d 344, 356 (N.D.N.Y. 2010) ("Importantly, since '[i]t is the employer's participation in the discriminatory practice which serves as the predicate for the imposition of liability on others for aiding and abetting,' a plaintiff 'cannot prevail against [an individual] on her state . . . claims unless she can first establish the liability of [her employer].' " (Alterations in original.) (first quoting *Murphy v. ERA United Realty*, 674 N.Y.S.2d 415, 417 (App. Div. 1998); then quoting *DeWitt v. Lieberman*, 48 F. Supp. 2d 280, 293 (S.D.N.Y. 1999))); *PFS Distrib. Co. v. Raduechel*, 492 F. Supp. 2d 1061, 1084 (S.D. Iowa 2007) ("To establish a civil claim for aiding and abetting under Iowa law, plaintiffs must prove: 1) *a wrong to the primary party*; 2) knowledge of the wrong on the part of the aider; and 3) substantial assistance by the aider in the achievement of the primary violation." (Emphasis added.) (citing *Ezzone v. Riccardi*, 525 N.W.2d 388, 398 (Iowa 1994))); *Tarr v. Ciasulli*, 853 A.2d 921, 929 (N.J. 2004) ("[I]n order to hold an employee liable as an aider or abettor, a plaintiff must show that . . . 'the party whom the defendant aids must perform a wrongful act that causes an injury . . . .' " (quoting *Hurley v. Atlantic City Police Dep't*, 174 F.3d 95, 127 (3d Cir. 1999))); *cf. Criterion 508 Sols., Inc. v. Lockheed Martin Servs., Inc.*, 806 F. Supp. 2d 1078, 1104 (S.D. Iowa 2009) ("If the plaintiff does not present sufficient evidence generating genuine issues of material fact for the underlying wrongful conduct, then the civil conspiracy claim also fails."); *Asplund v. iPCS Wireless, Inc.*, 602

F. Supp. 2d 1005, 1011 (N.D. Iowa 2008) ("While the Iowa Supreme Court has not construed ICRA's aiding-and-abetting provision, Plaintiff has a colorable argument that the Iowa Supreme Court would draw upon its criminal jurisprudence and hold that aiding and abetting occurs under ICRA when a person actively participates or in some manner encourages *the commission* of an unfair or discriminatory practice *prior to or at the time of its commission.*" (Emphasis added.)); *Wright v. Brooke Grp. Ltd.*, 652 N.W.2d 159, 174 (Iowa 2002) (civil conspiracy claim requires actionable underlying act).

We concluded above that Deeds failed to show the City engaged in a discriminatory practice. This means there is no ICRA violation that the UnityPoint defendants could aid and abet, so the UnityPoint defendants cannot be liable under section 216.11(1).

In any event, in *Sahai*, we expressly rejected the contention that "the clinic and its member doctors should be subject to sanction under the employment discrimination statutes . . . for recommendations that cause the employer to render discriminatory hiring decisions." 557 N.W.2d at 901.[10] We instead concluded that the actions of the clinic and its doctors are not covered by the ICRA when (1) the clinic plays an advisory role in the employer's hiring decision and (2) "[t]he advice being sought was an independent medical judgment." *Id.* We conclude that *Sahai*'s rationale applies when analyzing a physician's liability for aiding and abetting in discriminatory practices.

Deeds suggests that because Dr. McKinstry relied on NFPA 1582, her recommendation was not an independent medical judgment. We

---

[10]In *Sahai*, we analyzed a discrimination claim against a physician and medical clinic under section 216.6—rather than an aiding and abetting claim under 216.11. 557 N.W.2d at 901.

rejected such a contention in *Sahai.* There, the physician "candidly admitted during cross-examination that he would make the same recommendation against assembly line work for *any* prospective female employee in Davies' stage of pregnancy." *Id.* (emphasis added). Because of this admission, the [ICRC] found that Dr. Sahai's recommendation was not an independent medical judgment regarding Davies. *Id.* But we disagreed, noting that "physicians regularly issue medical opinions based on typical prognoses for similarly situated clinical settings." *Id.* at 901–02. We concluded that such evaluations could still be "individualized when rendered with respect to a particular individual in connection with a physical examination of that person." *Id.* at 902. That is what we have here. While Dr. McKinstry may have made the same recommendation, based in part on NFPA 1582, for any individual who experienced MS symptoms within the past three years, her evaluation was still individualized with respect to Deeds and the firefighting position.

Dr. McKinstry provided an advisory opinion based on her independent medical judgment. The district court correctly granted summary judgment for the UnityPoint defendants.

### IV. Disposition.

For these reasons, we affirm the decision of the court of appeals and the district court's summary judgment in favor of the City and the UnityPoint defendants.

**DECISION OF COURT OF APPEALS AND DISTRICT COURT SUMMARY JUDGMENT AFFIRMED.**

All justices concur except Appel and Wiggins, JJ., who dissent, and Hecht, J., who takes no part.

**APPEL, Justice (dissenting).**

I respectfully dissent.

A flat-out ban from employment on anyone with a recurrence of multiple sclerosis (MS) within the last three years is precisely the kind of stereotyping that the disability-discrimination provisions of the Iowa Civil Rights Act (ICRA) are designed to prevent. How is it that such stereotyping was applied to Nolan Deeds? The evasion of the ICRA was achieved when the employer contracted out the physical examination to a third party.

Can it be that an employer can avoid responsibility for disability discrimination by contracting out the physical examination to a third party and simply following the third party's conclusory recommendation that the person is not qualified for the job because of a medical condition? I do not think so.

I begin with an overview of disability stereotyping under the ICRA. The ICRA directs us to construe it "broadly to effectuate its purposes." Iowa Code § 216.18 (2014). In construing the prohibition on disability discrimination, we have endorsed the proposition that the prohibition on disability discrimination covers not just "affirmative animus" but also "discrimination based on thoughtlessness, apathy, or stereotype." *Palmer Coll. of Chiropractic v. Davenport Civil Rights Comm'n*, 850 N.W.2d 326, 333 (Iowa 2014) (applying framework for discrimination claims under the Federal Americans with Disabilities Act and Rehabilitation Act to claim made under ICRA); *see Alexander v. Choate*, 469 U.S. 287, 295–97, 105 S. Ct. 712, 717–18 (1985). Legislation prohibiting disability discrimination "assures that truly disabled, but genuinely capable, individuals will not face discrimination in employment because of

stereotypes about the insurmountability of their handicaps." *Probasco v. Iowa Civil Rights Comm'n*, 420 N.W.2d 432, 436 (Iowa 1988) (quoting *Forrisi v. Bowen*, 794 F.2d 931, 934 (4th Cir. 1986)). It does not matter if an employer acted in good faith in taking discriminatory actions when the discrimination is based on unfounded stereotyping. "Stereotyping is no less harmful to the handicapped employee when it is based on good faith." *Me. Human Rights Comm'n v. Canadian Pac. Ltd.*, 458 A.2d 1225, 1231 (Me. 1983).

How does the basic antistereotype principle of the ICRA apply in this case? Due to the physically demanding nature of being a firefighter, fire departments may properly screen employees to ensure that they meet the health requirements for the job. *See* Iowa Code § 400.8(1) (requiring physical examination of firefighter applicant to determine "physical or mental agility of the applicant" but prohibiting consideration of applicant's "height, weight, sex, or race"); Stephanie C. Griffin et al., *Evaluation of a Fitness Intervention for New Firefighters: Injury Reduction and Economic Benefits*, 22 Inj. Prevention 181, 181 (2016) ("Firefighting is a hazardous profession that often requires strenuous work in dynamic and unpredictable environments."). Under Iowa Code section 400.8(1), the Municipal Fire and Police Retirement System of Iowa sets the standards for the entrance examination. These standards do not mention MS. *See Medical Examination Protocol for Firefighters*, MFPRSI, [hereinafter MFPRSI, *Medical Examination Protocol*], www.mfprsi.org/site_mcdra/
pdfs/fire_protocal_2.pdf (last visited June 18, 2018) [https://perma.cc//KD9E-RZ4W].

The National Fire Protection Association (NFPA) Standard states that anyone with MS who has experienced a recurrence or a progression

of the disease within three years prior to the examination is precluded from serving as a firefighter. Nat'l Fire Prof. Ass'n, *NFPA 1582 Standard on Comprehensive Occupational Medical Program for Fire Departments* §§ 3.3.13.1, 6.17.1(4) (2013 ed.). The statutorily mandated Iowa standards, however, do not refer to the national standard nor direct healthcare providers to use the NFPA standard. MFPRSI, *Medical Examination Protocol.*

But a flat-out ban on anyone with a recurrence of MS within the last three years is exactly the sort of stereotyping about an illness that the ICRA was enacted to prohibit. *See Probasco*, 420 N.W.2d at 436. Such a ban is far from the sort of individualized medical determination that is required under the ICRA to be a legitimate medical reason for denying employment as a firefighter due to MS. *See Frank v. Am. Freight Sys., Inc.*, 398 N.W.2d 797, 801 (Iowa 1987); *see also Holiday v. City of Chattanooga*, 206 F.3d 637, 643 (6th Cir. 2000) (holding under the ADA, the district curt erroneously treated as dispositive a medical opinion that concluded the potential employee could not perform the job when there was no evidence the doctor conducted an individualized inquiry into whether the potential employee's disability would actually interfere with job performance); *Me. Human Rights Comm'n*, 458 A.2d at 1232–34 (rejecting, under the Maine Human Rights Act, medical examinations flatly disqualifying all candidates with certain medical conditions without statistical evidence that every person with that condition is unable to successfully perform the job, and requiring individual assessments).

So if the use of a flat-out ban is prohibited by the ICRA, does the fact that the stereotype was applied by a physician, whom the employer contracted with to perform medical evaluations of prospective employees, change anything? Under the Iowa law of agency, "[t]he party asserting

an agency relationship must prove its existence by a preponderance of the evidence." *Soults Farms, Inc. v. Schafer*, 797 N.W.2d 92, 100 (Iowa 2011); *see Chariton Feed & Grain, Inc. v. Harder*, 369 N.W.2d 777, 789 (Iowa 1985) (en banc). An agency relationship is created by (1) a manifestation of consent by the principal that the agent shall act on the principal's behalf and subject to the principal's control, and (2) "consent by the [agent] to so act." *Soults Farms*, 797 N.W.2d at 100 (quoting *Pillsbury Co. v. Ward*, 250 N.W.2d 35, 38 (Iowa 1977)). "An agency relationship can be established through the agent's actual or apparent authority to act on behalf of the principal." *Id.*; *accord Fed. Land Bank of Omaha v. Union Bank & Tr. Co. of Ottumwa*, 228 Iowa 205, 209–10, 290 N.W. 512, 514–15, *supplemented on other grounds on denial of reh'g*, 292 N.W. 852, 853 (Iowa 1940).

Although the issues before the court in *Sahai v. Davies*, 557 N.W.2d 898 (Iowa 1997) (en banc), were somewhat different, the case is still instructive. In *Sahai*, a prospective employee sued the prospective employer as well as the physician and medical clinic (medical defendants) that performed the preemployment physical on behalf of the prospective employer. *Id.* at 899, 900 (plurality opinion).[11] The Iowa Civil Rights Commission found that the medical defendants engaged in sexual discrimination, but the *Sahai* court reversed. *Id.* at 899. The *Sahai* plurality found the medical defendants did not commit sexual discrimination because there was no evidence that the physician's recommendation not to hire the plaintiff was solely based on a stereotyped judgment that all pregnant women were unable to perform the job. *Id.* at 901–02. We noted that while the physician's written

---

[11]In *Sahai*, four justices joined the plurality, Justice Harris concurred in the result, and four justices dissented. 557 N.W.2d at 899, 903.

opinion was simply a conclusory recommendation not to hire the plaintiff, the physician subsequently phoned the prospective employer and expressed his belief that women who were fourteen-weeks pregnant should not be hired to do assembly-line work when they had never done that type of work before. *Id.* at 902. We explained that, at that point, the prospective employer was "free to ask follow-up questions" to determine whether the physician's recommendation was based on stereotyped views of pregnant women or on the plaintiff's individual limitations, and since it did not it "might have violated employment discrimination laws." *Id.* But this did not make the physician's recommendation itself a sexually discriminatory act. *Id.* While this observation is dicta, it strongly suggests that the plaintiff may have had a discrimination claim against her prospective employer. However, the issues involving the prospective employer were not the subject of the appeal. *Id.* at 900, 902.

As in *Sahai,* the City certainly was free to ask follow up questions. When Dr. Ann McKinstry performed a physical examination on Deeds, she learned from him that he had MS. After consulting with Dr. Jeffrey Westpheling and reviewing Deeds's medical records from his neurologist and the NFPA Standards, Dr. McKinstry completed the MFPRSI medical examination form and indicated Deeds was not qualified to do the essential functions of the job. She did not indicate on the form why he was not qualified, even though the form requested the physician to do so. The form was faxed to the Marion fire chief but he made no inquiry into the reason for the disqualification. As in *Sahai,* the City followed a "don't ask, don't tell" approach.

Other courts have held that when a doctor is conducting a mandatory health screening on behalf of an employer, the doctor may be an agent of the employer. *See Garlitz v. Alpena Reg'l Med. Ctr.,* 834

F. Supp. 2d 668, 680–81 (E.D. Mich. 2011); *Jimenez v. Dyncorp Int'l, LLC*, 635 F. Supp. 2d 592, 602–04 (W.D. Tex. 2009); *cf. Tex. Emp'rs' Ins. Ass'n v. Vineyard*, 296 S.W.2d 588, 590 (Tex. Civ. App. 1956) (holding the doctor conducting the workers' compensation examination was the employer's agent, such that the doctor's fraudulent statements to the employee in settlement negotiations were the responsibility of the employer).

In *Jimenez*, the employer required job applicants to undergo training and evaluations by independent contractors, which included a psychological evaluation conducted by a doctor employed by one of the independent contractors. 635 F. Supp. 2d at 597. The plaintiff failed the psychological exam, and the employer rescinded its conditional offer of employment. *Id.* at 598–99. The plaintiff alleged the doctor failed her based on gender discrimination. *Id.* at 599.

The federal district court held the doctor was the agent of the employer under Title VII based on common law agency principles and the liberal interpretation given to Title VII provisions. *Id.* at 601–02. The court noted the plaintiff's failed psychological evaluation was the sole basis for the employer rescinding the employment offer and the employer provided no further review of the doctor's decisions before rescinding the offer. *Id.* at 602. Thus, the court explained, "it is clear that [the employer] delegated to [the doctor] and [the independent contractor] the power to 'hire, fire, and perform other employer functions'" or, at the very least, allowed the doctor to "participate[] in the decision-making process" of the employer. *Id.* (first quoting *Cuesta v. Tex. Dep't of Criminal Justice*, 805 F. Supp. 451, 455 (W.D. Tex. 1991); and then quoting *Hamilton v. Rodgers*, 791 F.2d 439, 443 (5th Cir. 1986),

*overruled on other grounds by Harvey v. Blake*, 913 F.2d 226, 228 n.2 (5th Cir. 1990)).

The court distinguished the case from *Crocker v. Runyon*, 207 F.3d 314 (6th Cir. 2000). *Jimenz*, 635 F. Supp. 2d at 602–03. The *Crocker* court held the employer's reliance on outside medical opinions in making its hiring decision was not discriminatory, 207 F.3d at 319, but the *Jimenez* court noted, "the plaintiff in *Crocker* never argued that the doctors providing medical opinions were agents of the [employer]," 635 F. Supp. 2d at 602. Consequently, unlike in *Jimenez*, the issue in *Crocker* was not whether the plaintiff failed to show the defendant took an adverse employment action because of the handicap, but rather whether the plaintiff was able to show that he was otherwise qualified for the job with or without a reasonable accommodation. *Compare Crocker*, 207 F.3d at 318–19, *with Jimenez*, 635 F. Supp. 2d at 603.[12]

In *Garlitz*, the federal district court held there was a genuine issue of material fact as to whether the preemployment-examination doctor was the defendant-employer's agent. 834 F. Supp. 2d at 680. As a condition of the offer of employment, the defendant required the plaintiff to undergo a medical examination at an independent clinic that was contracted to perform preemployment examinations. *Id.* at 672. The

---

[12]In *Crocker*, the defendant's physicians did conduct individualized preemployment physicals on the plaintiff, and the plaintiff was only able to present more favorable medical opinions based on examinations conducted years after the defendant decided not to hire the plaintiff. 207 F.3d at 317–18. Such examinations conducted years later, the United States Court of Appeals for the Sixth Circuit explained, did not show that the plaintiff was qualified at the time of the hiring decision. *Id.* at 318. The court contrasted the physicians' individualized examinations of the plaintiff to determine the plaintiff's job capabilities with *Holiday*, 206 F.3d 643–44, where there was evidence of the plaintiff's contemporaneous ability to serve as a police officer and the physician did not consider the plaintiff's personal HIV symptoms and prognosis but based his medical opinion on the stereotyped view that individuals with HIV could not serve as police officers. *Crocker*, 207 F.3d at 320. In *Crocker*, the employer relied on the individualized, nonstereotyped opinions in good faith. *Id.*

plaintiff refused to answer the clinic's medical-history questions about pregnancy and birth control, and the clinic did not pass her because she withheld the information. *Id.* at 673. The defendant then rescinded its offer of employment. *Id.* at 673–74. The defendant argued that it was not responsible for the questions asked by the clinic—the clinic was an independent organization and the defendant did not direct it to ask the questions—and, thus, it was entitled to summary judgment on the discrimination claim. *Id.* at 679, 680.

In determining whether the clinic was the defendant's agent, the *Garlitz* court looked at the common law of agency and the Restatement (Second) of Agency. *Id.* at 681. The court noted that the Restatement (Second) defines the agency relationship as "the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act." *Id.* (quoting Restatement (Second) of Agency § 1, at 7 (1958) [hereinafter Restatement (Second) of Agency]). Here, the court explained, the defendant "delegated to [the clinic] the authority to make certain aspects of [the defendant's] employment decisions." *Id.* The plaintiff needed to pass the clinic's health examination to receive the job, and she could not pass unless she answered all of the questions asked by the clinic. *Id.* Further, the defendant and the clinic's relationship was exclusive—the defendant sent all of its potential employees to the clinic for preemployment physicals unless the clinic lacked the capacity to conduct the physicals. *Id.* at 681–82. The court concluded the defendant, "[i]n practical terms, . . . delegated some hiring decisions to [the clinic]." *Id.* at 682.

On the issue of the amount of control the defendant exercised over the clinic's screening practices, there was a genuine issue of material fact as to whether the defendant ever communicated to the clinic the reason

why it was sending individuals to the clinic. *Id.* at 682–83. The court acknowledged,

> [I]t is possible that [the defendant] never communicated the reason it was paying [the clinic] to conduct these physicals, the reason it wanted these individuals to receive physicals, the type of information [the defendant] wished to obtain from the physicals, or [the defendant's] purpose in entering into the exclusive, ongoing arrangement with [the clinic] to have [the clinic] provide physicals.

*Id.* at 683. Yet there was some testimony from the defendant "that [it] and [the clinic] had worked together to develop the content of the physical exams" the clinic used to determine whether the employee was qualified to perform the essential functions of the job. *Id.* While this testimony created a genuine issue of material fact, ultimately, "the actual exercise of control is not essential to create an agency relationship." *Id.* The dispositive finding is "the *right* to control the conduct of the agent," not whether the principal ever exercised that control. *Id.* (emphasis added) (quoting Restatement (Second) of Agency § 14, at 60). The court thus denied this part of the defendant's motion for summary judgment. *Id.* at 690.

Here, Deeds has created a genuine issue of material fact as to whether the UnityPoint defendants were the City's agents. A reasonable fact finder could conclude that the City had control over how the UnityPoint defendants conducted their exams for the City's firefighters based on the testimony of Dr. McKinstry. Like in *Garlitz*, there is some evidence the City communicated to the UnityPoint defendants its requirements about physicals and what it wished to obtain from the physicals. *See id.* at 681, 682–83. A medical provider that is truly not an agent of the employer would only incidentally conduct physicals on the employer's behalf, e.g., without a contractual relationship. *Cf. id.* at

682 (noting defendant—principal—contracted with third party—agent—to perform the examinations); *Jimenez*, 635 F. Supp. 2d at 597 (same). A reasonable jury could find the City's control over the UnityPoint defendants demonstrated a principal–agent relationship.

Further, like in *Garlitz* and *Jimenez,* a fact finder could determine the City, in effect, delegated its employment decisions to the UnityPoint defendants. *See Garlitz*, 834 F. Supp. 2d at 82; *Jimenez*, 635 F. Supp. 2d at 602. Deeds had to pass the physical in order to be employed by the City. The fact that Deeds did not pass the physical was the only reason why the City rescinded its conditional offer of employment.

The majority focuses on the facts that the UnityPoint defendants are independent contractors and that the City did not control how Dr. McKinstry conducted the examination. However, just because the UnityPoint defendants are independent contractors, does not mean that they are not the City's agents. And, as I explained above, there is some evidence in the record suggesting the City *did*, in some sense, control how Dr. McKinstry conducted the examination by directing the UnityPoint defendants to perform certain medical tests for the purpose of ensuring that potential employees were able to serve as firefighters. The mere fact that Dr. McKinstry may have exercised some medical judgment in conducting the tests does not change this crucial element of control.

Here, unlike in *Sahai*, we are considering whether an employer discriminated against an employee when the employer did not ask the UnityPoint doctor for the basis of the medical disqualification. *See* 557 N.W.2d at 901 (noting the gender discrimination issues involving the employer were not the subjects of the appeal; only the discrimination issues involving the doctor and the clinic were). *Sahai* suggests that

such an employer commits discrimination when it fails to do so. *Id.* at 902.

To hold otherwise would be to encourage employers to take a "don't ask, don't tell" approach. This would permit employers to evade the ICRA. *Cf. Bates v. Dura Auto. Sys., Inc.,* 767 F.3d 566, 577 (6th Cir. 2014) ("[A]n employer cannot hire a third party to discriminate on its behalf."); *Wilks v. Taylor Sch. Dist.,* 435 N.W.2d 436, 437–38 (Mich. Ct. App. 1988) (per curiam) (noting defendants are not shielded from liability due to relying on doctor's opinion because to hold otherwise could allow the employer "and its hired physician [to] collude, connive or conspire to eliminate a handicapped applicant's chances for employment . . . by making certain that the applicant never be issued the medical certification required under the law"); Mary Crossley, *Infected Judgment: Legal Responses to Physician Bias,* 48 Vill. L. Rev. 195, 279 (2003) (cautioning that biased medical decisions could be beyond the reach of antidiscrimination laws if the employer is able to escape liability for a physician's medical disqualification); Daniel L. Stickler & Albert F. Sebok, *Legal Issues Surrounding Preemployment Physical Examinations in the Coal Industry,* 94 W. Va. L. Rev. 811, 827 & n.84 (1992) ("Courts, however, will not find an employer immune from claims of handicap discrimination merely because the employer has relied upon a physician's opinion.").

I now turn to the question of whether Deeds may be considered responsible for the employer's actions because of his failure to engage in the interactive process. I would not uphold the district court's ruling on the basis of Deeds's failure to cooperate with the interactive process. The City offered Deeds retesting only after it denied him employment due to his MS. A potential employee must comply with the interactive process

only when the employer seeks to offer the potential employee a reasonable accommodation for the disability, not after the employer has already denied employment. *See Fahey v. Twin City Fan Cos.*, 994 F. Supp. 2d 1064, 1079 (D.S.D. 2014) (emphasizing that an employer has a duty to engage in an interactive process in good faith before rescinding an offer of employment based on a disability when it is aware of the general disability but not the employee's individual limitations); *see also Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 313–14 (3d Cir. 1999) (explaining that an employer's knowledge of an employee's disability and the employee's desire to work in spite of the disability triggers the employer's duty to initiate the interactive process before taking negative employment action and that no magic words requesting a "reasonable accommodation" are needed).

Next, there is a question of whether the district court properly dismissed Deeds's claim against the UnityPoint defendants. I would reverse the district court's grant of summary judgment to the UnityPoint defendants. Iowa Code section 216.11(1) states that intentionally aiding and abetting "another person" engaging in any unfair or discriminatory practice under the ICRA is itself an unfair or discriminatory practice prohibited by the Act.

Here, unlike in *Sahai*, there is substantial evidence in the record that Dr. McKinstry did not exercise her independent medical judgment in determining that Deeds was not medically qualified for the position. *See* 557 N.W.2d at 901. Dr. McKinstry testified that once she learned Deeds had MS and the NFPA Standard banned anyone with MS from serving as a firefighter, any further exploration of Deeds's actual ability to perform the essential functions of the job with or without reasonable accommodations was "a moot point." This stereotyped thinking without

considering whether the individual employee can perform the essential functions of the job is the kind of discrimination that the ICRA is designed to prevent.  *See Probasco*, 420 N.W.2d at 436.  Further, unlike in *Sahai*, there is evidence that the City simply adopted the conclusory disqualification and that the UnityPoint defendants did not act in an advisory role.  *See* 557 N.W.2d at 901.  I conclude there was adequate evidence to show the UnityPoint defendants aided and abetted the discriminatory action of the City.

For the above reasons, I would vacate the decision of the court of appeals, reverse the judgment of the district court, and remand the case for further proceedings.

Wiggins, J., joins this dissent.