# IN THE COURT OF APPEALS OF IOWA

No. 24-0735
Filed October 1, 2025

**MATTHEW LEWIS HUNTER,**
    Plaintiff-Appellee,

**vs.**

**CITY OF DES MOINES, IOWA,**
    Defendant-Appellant,
_____

Appeal from the Iowa District Court for Polk County, Paul D. Scott, Judge.


An employer appeals the denial of its motions for new trial and judgment notwithstanding the verdict after trial on a former employee's disability discrimination claims. **REVERSED AND REMANDED.**


Michelle Mackel-Wiederanders (argued) and Luke DeSmet, Assistant City Attorneys, Des Moines, for appellant.

David Albrecht (argued) of Fiedler Law Firm, P.L.C., Johnston, and Kellie L. Paschke and Kelly Verwers Meyers of Skinner & Paschke, P.L.L.C., West Des Moines, for appellee.


Heard at oral argument by Tabor, C.J., and Greer, Ahlers, Badding, and Sandy, JJ.

**BADDING, Judge.**

Nobody's career should be defined by its lowest points. But here, we must dwell on two of the worst days in Matthew Hunter's twenty-one years as a Des Moines police officer. The first was September 16, 2020, when Hunter witnessed the suicide scene of his longtime friend and former partner. The second was June 6, 2021, when Hunter—struggling with his then-undiagnosed post-traumatic stress disorder (PTSD)—drank "probably a bottle of whiskey" at a family gathering and lashed out at police as they stopped him from driving away. His conduct that night led to the termination of his employment.

Hunter sued the City of Des Moines for violations of the Iowa Civil Rights Act, *see* Iowa Code § 216.6 (2021), alleging that he was discharged because of his disability and that the City failed to accommodate his request for more time to improve his mental health. A jury awarded him $2.6 million in damages.

On appeal from that verdict, the City contends that it was entitled to judgment notwithstanding the verdict on each of Hunter's claims or, alternatively, that it should have been granted a new trial due to incorrect jury instructions and improperly admitted evidence. We agree that the verdict on Hunter's failure-to-accommodate claim cannot stand because an excuse for prior misconduct is not a reasonable accommodation. And because the district court incorrectly instructed the jury that employers are liable for discriminatory motives they "do not acknowledge or realize," we remand for a new trial on Hunter's discrimination claim.

## I.    Background Facts and Proceedings

Hunter began working as a patrol officer for the Des Moines Police Department in 2000.  He held that position for the next two decades, during which he received accolades from citizens and supervisors alike.  Yearly performance evaluations noted that Hunter kept a "calm demeanor even during high risk calls," was "professional and compassionate with victims," and made "every effort to know citizens in his district."  Aside from a one-day suspension for a traffic infraction, his disciplinary record was unblemished.  In May 2021, Hunter was promoted to the rank of sergeant.

Witnesses at trial testified that police work requires a special ability to keep calm under pressure.  The City's formal job description for the position of police officer puts it this way:

> **Mental Requirements:** Work under highly stressful and emotional conditions.  Maintain control of emotions; keep personal feelings to self.  Use sound judgment in emergency situations.  Maintain intense concentration and alertness during stressful situations.  Maintain alertness in extreme conditions, particularly when preceded by extended periods of relative low stress or monotony. . . .

Des Moines police sergeants must demonstrate the same "knowledge, skills and abilities as a Police Officer," including the ability "to work in chaotic and dangerous situations while maintaining control over one's emotions and composure."  There is no dispute that Hunter's supervisors believed he possessed all the qualifications of a police sergeant when he was promoted.  But beneath his professional façade, Hunter's mental health was faltering.

**A.      Hunter's Mental-Health Decline**

In September 2020, Joe Morgan, another Des Moines police sergeant, died by suicide outside his home.  Hunter and Morgan had been partners during Hunter's early years on the force.  They developed a lasting friendship, and their families spent time together outside of work.  When Hunter learned about Sergeant Morgan's death, he raced to Morgan's house to find emergency workers on the scene.  Hunter saw Morgan's body in the driveway.  His shirt had been removed, exposing a gunshot wound to his chest.

The next morning, Hunter reported for roll call, where police department leaders addressed Morgan's death in a tone that Hunter considered callous.  He recalls Police Chief Dana Wingert telling the officers that "we're never going to know why" Morgan took his life, and "[w]e're not going to waste time trying to figure it out."  Because Morgan died by suicide, the City declined to extend him the burial honors typically provided to officers killed in the line of duty.  Hunter—who believes Morgan's own traumatic experiences in law enforcement contributed to his death— viewed the City's decision as a "message that . . . Morgan [w]as less than other fallen officers" and as a sign of "distaste for mental-health issues."

Des Moines Police Department policy requires that officers "involved in incidents that result in serious injury or death to any person . . . attend at least two counseling sessions."  About a week after Sergeant Morgan's death, Hunter visited his family counselor, Dr. David Grove, and reported that he was experiencing "anxiety and some depression," as well as "intrusive imagery of [Morgan's] suicide."  Dr. Grove opined that Hunter was experiencing acute stress disorder

caused by Morgan's death and recommended that he return for psychotherapy. Hunter did not follow up with Dr. Grove.

A few weeks later, Hunter attended a department-mandated counseling session with Dr. Phil Ascheman, a City psychologist. They "talked about what [Hunter] had witnessed" and the "mental health . . . aspect" of suicide. Hunter recalled being "honest" but "careful" during this appointment, aware that Dr. Ascheman was evaluating his fitness for duty. He did not disclose that he had been diagnosed with acute stress disorder by Dr. Grove. When Dr. Ascheman cleared Hunter for service, Hunter agreed. He testified at trial that, based on this session, "I felt that I was probably dealing with things okay."

But in late October, while reminiscing about Sergeant Morgan over dinner with his wife and a friend, Hunter was struck by a wave of emotion. In his words, "I got to a point where I couldn't control my emotions basically. I was very upset, crying and inconsolable." The group called one of Hunter's coworkers, Sergeant Tony Ballantini, who came out to speak with Hunter. They talked about the tragedy of Morgan's death and their mutual grief. Ballantini suggested that the men visit a counselor together, but Hunter never followed through with that offer. He also asked Ballantini not to tell command staff about their conversation because he was worried it might "hinder [his] ability to get promoted." Hunter later explained that, when he met with Ballantini, "I didn't know that what I was experiencing wasn't normal."

That difference remained elusive for Hunter six months later, when he experienced another triggering event at work. On May 31, 2021, Hunter responded to the scene of a suspicious death at a Des Moines home. He found

an elderly man deceased on the couch with a self-inflicted gunshot wound to his chest. The scene immediately caused Hunter to see images of Sergeant Morgan's body. He silently retreated to the attic of the house to "try to collect [himself]." When another officer checked on Hunter, he denied any distress. Later, Hunter's supervisor asked if he was okay after visiting the suicide scene. Hunter responded, "Yeah, I'm fine."

### B.    Hunter's Arrest

About a week later, on the evening of June 5, 2021, Hunter attended a backyard gathering at a family member's home outside Des Moines. The party was to celebrate a recent marriage, but Hunter's mind was elsewhere. He testified:

> There was a lot of emotion. I mean, those type of happy events should be happy. But you start down a road—or at least I did— thinking about [Sergeant Morgan's] kids getting married, how he's not going to see those things, how he's not going to be able to celebrate those milestones, so to speak. So that was weighing heavily on my mind. Also, with that other suicide that had just happened a few days prior, that was—there was a lot there, so to speak. . . . It's kind of like a loop sometimes.

To silence his thoughts, Hunter started drinking. He consumed "probably a bottle of whiskey" during his time at the party. At some point, other attendees brought out marijuana. Although he was intoxicated, Hunter knew he needed to leave. He got into his truck and began to drive away. Hunter's wife ran after, pounding the tailgate to get him to stop.

Less than a block later, Indianola police sergeant Justin Keller encountered Hunter and his wife while on routine patrol. Believing he had chanced on "a domestic abuse situation," Sergeant Keller activated his lights and approached Hunter's truck. Hunter stepped out. He was immediately belligerent and

noncooperative, and he refused orders to get back into the truck. As other officers arrived, Hunter taunted and insulted them, shouting: "I'm not in your face." "Do you want me to get in your fucking face?" "Fuck you." "You want to fuck with me?" "I'll fuck you." "Fucking cunt." "You want it? You want it? You wanna fuck with me? Fuck with me." "You are Podunk fucking nothing." Sergeant Keller arrested Hunter for public intoxication. Hunter resisted the officer's efforts to apply handcuffs.

Hunter's aggressive behavior continued as he was booked and transported to an out-of-county jail. Among other hostilities, he warned booking staff that they were "all going to lose [their] jobs," that he was "a fucking sergeant at the Des Moines Police Department," and that he would "fuck [them] over" if they "ever came to Des Moines." He told a transport officer, "I am going to fuck your life up," and "I will kill you and your family." Some of these individuals later testified that they did not consider Hunter's threats to be genuine. Upon arrival at the jail, Hunter consented to a preliminary breathalyzer test, which returned an estimated blood-alcohol content of .210.

## C. Disciplinary Process

The City placed Hunter on administrative leave pending an investigation into his conduct. During an interview with the department's Office of Professional Standards on June 8, 2021, Hunter initially attributed his behavior to his intoxication. He could not recall making threats to the jailers and transport officer. Later in the interview, he divulged:

> I've been having some issues with Joe [Morgan], and so I'm not saying that is an excuse for this. I am just saying that that's been a struggle . . . . Does it relate? I'm not sure, but I know that that's been an issue that [has] been ongoing, and I'm trying to handle and deal with. But there's no excuse for those things if I said them other than

really bad judgment, and obviously I was severely intoxicated, which there's no excuse for that either.

. . . .

. . . [L]ike I said, I don't have a great explanation as to my actions other than, you know, I've been trying to get some help and deal with Joe being gone and that's been an ongoing battle. . . . [T]here's things that are probably released a little bit when I've been drinking that normally wouldn't be there.

Hunter also told the interviewers about the suicide scene he had witnessed the week before, noting it was the "first suicide by self-inflicted gunshot wound . . . to [the] chest" he had responded to since Sergeant Morgan's death.

The next day, Hunter emailed Chief Wingert and other supervisors, informing them that he had contacted the department's employee assistance program for "evaluation and counseling" and made an appointment with a therapist for "treatment in relation to Sergeant Joe Morgan's suicide." Hunter stated that he had "struggled with the trauma of [Morgan's] death" and that he had mistakenly "believed that [he] could handle any situation with no outside help." After apologizing for his behavior, Hunter closed by writing, "I hope to have your support."[1]

After the fact-finding interview with the Office of Professional Standards, two of Hunter's superiors—a captain and the assistant chief—recommended termination. Upon learning of those recommendations, Hunter requested review by the Chief's Guidance Committee, an advisory panel of three police department supervisors. Following an informal hearing, the panel returned its findings and

---

[1] On June 12, Hunter sent a second email to Chief Wingert expressing additional regrets for making homophobic remarks to the transport officer. He acknowledged that he "needed to get help for the trauma" of Morgan's suicide and that "in no way could [he] handle that on [his] own."

recommendations on June 23. All three panelists agreed that Hunter had violated the department's standards of conduct, including those that required officers to "cooperate with all law enforcement agencies" and prohibited them from behaving "in a manner, on or off duty, that casts doubt on their integrity, honesty, judgment, or character; brings discredit to this agency; or impairs the agency's efficient and effective operation." A panelist nominated by Hunter recommended a thirty-day suspension, fitness for duty evaluation, and mandatory counseling. The other two recommended termination. All three panelists suggested that Hunter "may have issues with PTSD and Alcoholism."

On June 28, Hunter attended a final pre-disciplinary meeting with Chief Wingert. During the meeting, Hunter expressed his remorse and told the chief that he "did not foresee, nor would I have been able to see" the extent of his mental-health problem until his arrest on June 5. Hunter disclosed that he was suffering from PTSD—a diagnosis he had received from Dr. Grove just a few days before the meeting. He told Chief Wingert that he was "here asking for a second chance," and that, with time and counseling, he could get "back to the place where [he] was." The chief informed Hunter that he would need more than "a day or two" to review the case and that Hunter should not expect an immediate decision.

But the next day, the City terminated Hunter's employment for violating the police department standards of conduct. At trial, Chief Wingert testified that his decision to terminate Hunter was based on a combination of facts from the June 5 incident, including Hunter's resistance to arrest, his insults and slurs toward other law enforcement officers, his operation of a vehicle while intoxicated, and—in what

Chief Wingert deemed Hunter's "most egregious" policy violation—his attempt to intimidate other officers by invoking his authority as a Des Moines police sergeant.

### D. The Lawsuit

Hunter sued the City of Des Moines, asserting violations of the Iowa Civil Rights Act. The case proceeded to trial on two claims. First, Hunter alleged that the City engaged in disability discrimination by terminating him, at least in part, because of his PTSD. Second, he claimed that the City denied him a reasonable accommodation when it rejected his request for additional time to work on his mental health. Following five days of evidence, the jury returned a verdict finding the City liable on both claims. It awarded Hunter over $2.6 million in front pay, back pay, and emotional distress damages.

The City moved for judgment notwithstanding the verdict. Among other grounds, it argued that Hunter had failed to prove that he was qualified for his role, failed to show he was terminated for any reason other than misconduct, and failed to establish that he requested an accommodation, "reasonable or otherwise." Alternatively, the City requested a new trial, alleging procedural, evidentiary, and instructional errors. The district court denied the City's post-trial motions and granted Hunter's request for $426,000 in attorney fees, expenses, and costs. This appeal followed.

## II. Discussion

The City asserts—by our tally—ten distinct claims of error challenging the sufficiency of the evidence, the district court's jury instructions, the admission of evidence at trial, and Hunter's attorney fee award. We approach the issues in a

different order than they are presented by the City's appellate brief, beginning with the City's challenges to the merits of Hunter's claims.

### A.    Disability Discrimination

The City argues that the district court erred by denying judgment notwithstanding the verdict on Hunter's disability discrimination claim. Our review is for correction of errors at law. *Selden v. Des Moines Area Cmty. Coll.*, 2 N.W.3d 437, 443 (Iowa 2024). We must uphold the district court's decision if, when viewing the record in the light most favorable to Hunter, substantial evidence supports each element of his claim. *White v. State*, 5 N.W.3d 315, 323 (Iowa 2024). "Evidence is substantial if reasonable minds would accept the evidence as adequate to reach the same findings." *Id.* (cleaned up).

The Iowa Civil Rights Act prohibits an employer from "discharg[ing] any employee . . . because of the . . . disability of such . . . employee." Iowa Code § 216.6(1)(a).[2] To prove a claim of disability discrimination under the statute, a claimant must initially establish: "(1) he or she is a disabled person; (2) he or she is qualified to perform the job, with or without an accommodation; and (3) he or she suffered an adverse employment decision because of the disability." *Casey's Gen. Stores, Inc. v. Blackford*, 661 N.W.2d 515, 519 (Iowa 2003); *accord Rumsey v. Woodgrain Millwork, Inc.*, 962 N.W.2d 9, 22 (Iowa 2021). The parties stipulated at trial that Hunter's PTSD was a protected disability under the Iowa Civil Rights

---

[2] While we typically look to the law of the case in reviewing for sufficiency of the evidence, "the jury instructions do not limit our analysis" when, as here, relevant instructions are in dispute. *Rumsey v. Woodgrain Millwork, Inc.*, 962 N.W.2d 9, 21 (Iowa 2021).

Act. However, the City denies that Hunter satisfied the second and third elements of his discrimination claim. We address those elements in turn.

### 1. Hunter's Qualifications

The City first argues that Hunter's undisputed PTSD diagnosis renders him unqualified to perform the work of a police sergeant. It cites federal court decisions finding emergency workers experiencing PTSD or similar mental disabilities could not be relied upon to "react quickly and calmly in high-stress and potentially life-threatening situations." *Jordan v. City of Union City*, 646 F. App'x 736, 741 (11th Cir. 2016) (per curiam) (finding a police officer was "likely to have unpredictable and unpreventable anxiety episodes while on duty that would affect his ability to process and manage stress"); *see also Abler v. Mayor and City of Baltimore*, No. 18-3668, 2022 WL 824850, at *8–9 (D. Md. Mar. 18, 2022) (finding a plaintiff failed to show "how, despite his PTSD and 'extremely debilitating' medical conditions, he was able to perform the essential functions of a firefighter, such as extinguishing fires and rescuing emergency victims").

We may look to federal case law for guidance when analyzing disability discrimination claims under the Iowa Civil Rights Act. *See, e.g.*, *Rumsey*, 962 N.W.2d at 29. But the City's authorities are of little help here, because the qualified-individual element of a discrimination claim is a fact-intensive analysis. We must apply an "individualized inquiry" to determine whether Hunter was qualified for his job "despite his . . . disability." *Goodpaster v. Schwan's Home Serv., Inc.*, 849 N.W.2d 1, 15 (Iowa 2014); *accord Bearshield v. John Morrell & Co.*, 570 N.W.2d 915, 923 (Iowa 1997) ("An employer's reliance on myths, fears, and stereotypes is directly contrary to the ADA and ICRA's requirement that

persons be individually assessed as to their ability to perform the job in question.").
In doing so, we ask whether Hunter could "perform the essential functions of the position, with or without reasonable accommodation." *Rumsey*, 962 N.W.2d at 22 (cleaned up).

Des Moines police sergeants are required "to work in chaotic and dangerous situations while maintaining control over [their] emotions." According to the City, the evidence shows that Hunter's PTSD symptoms could interfere with his ability to perform this essential function. Dr. Grove testified that when Hunter was terminated, he was experiencing flashbacks, impaired concentration, irritability, loss of emotional control, and intense distress when exposed to cues. He also acknowledged that Hunter could not predict how his symptoms would impact him each day, that Hunter may unexpectedly lose control of his behavior, and that simply "holding or being exposed to guns" might be triggering. Hunter continued to experience PTSD symptoms up to the time of trial. The City contends the risk of Hunter being triggered while on duty disqualifies him from the work of a police sergeant.[3]

---

[3] By implying that Hunter could pose a safety risk to others if he experienced an episode of PTSD while on duty, the City appears to assert what federal courts call a "direct threat" defense. *See, e.g.*, *McKenzie v. Benton*, 388 F.3d 1342, 1353–55 (10th Cir. 2004) (upholding verdict in favor of employer where jury found law enforcement applicant with PTSD posed a direct threat to herself and others). We question whether the essential-functions analysis is the best fit for this type of argument. *See Goodpaster*, 849 N.W.2d at 15 (noting "conceptual daylight would ordinarily exist between the 'essential function' aspect of a prima facie case of disability discrimination and the 'direct threat' defense under the ADA"). However, the jury in this case was not instructed on the direct-threat defense; it was asked to determine whether Hunter "could have performed the essential functions" of his role, with or without accommodation, at the time of his discharge. Consistent with that instruction, the City maintains on appeal that Hunter was disqualified under the essential-functions test. So we confine our review to that analysis.

But other evidence cuts against the City's worries. Dr. Grove also testified that some individuals with PTSD can reliably control their symptoms and function in the world. For approximately six months after Sergeant Morgan's death, Hunter continued to successfully perform his police functions while privately coping with his mental-health struggles. On the one occasion he experienced PTSD symptoms while at work—the scene of the May 31 suicide—he managed his emotions by collecting himself in another room. The City's own psychologist concluded Hunter was fit for duty in October 2020. And perhaps most importantly, Chief Wingert agreed that Hunter was capable of performing the functions of a sergeant when he was promoted less than a month before his arrest.

The City suggests we should look past these facts because "Hunter's conduct [on June 5] alone disqualified him from continuing to work as a police officer." But that argument asks us to weigh the competing evidence as to Hunter's qualifications, which is not a part of our review. *See Becker v. D & E Distrib. Co.*, 247 N.W.2d 727, 730 (Iowa 1976) ("The weight and credibility of testimony are matters for the jury."). It was the jury's role to decide whether Hunter's behavior during the June 5 arrest or his otherwise satisfactory record was the better indicator of his ability to perform his essential functions going forward. Viewing the evidence in the light most favorable to Hunter, we find substantial proof that he remained qualified for the position of police sergeant despite his disability.[4]

---

[4] Because we find substantial evidence that Hunter could perform the duties of a police sergeant without accommodation, we need not consider his alternative argument that he could have been reassigned to an administrative role. *See Rumsey*, 962 N.W.2d at 22–23 (noting that an employee's inability to perform the essential functions of a current job assignment "is not the end of the inquiry" and

### 2.   *Motivating Factor*

The City also contends Hunter failed to show he was terminated "because of [his] . . . disability."  Iowa Code § 216.6(1)(a).  Our supreme court has adopted a motivating-factor standard for evaluating this element.  *See Hawkins v. Grinnell Reg'l Med. Ctr.*, 929 N.W.2d 261, 271 (Iowa 2019) (noting this standard is "lower . . . than the determining-factor standard" applied to other claims).  "Discrimination is a 'motivating factor' in an adverse action if an employee's status as a member of a protected class 'played a part' in the employer's decision."  *Haskenhoff v. Homeland Energy Sols., LLC*, 897 N.W.2d 553, 582 (Iowa 2017) (citation omitted).  The City argues that it was entitled to judgment notwithstanding the verdict because "Hunter's termination was based on his egregious conduct" alone and because the City "would have made the same decision" regardless of Hunter's disability.  We do not find the record to be so one-sided.

"[A] discriminatory motive will rarely be announced or readily apparent."  *Hamer v. Iowa C.R. Comm'n*, 472 N.W.2d 259, 263 (Iowa 1991).  Instead, a plaintiff often must rely on circumstantial evidence to prove this element of their claim.  Hunter sought to raise an inference of discrimination through a number of circumstances.  Foremost was the timing of his termination, which came one day after he disclosed his PTSD diagnosis.  *See DeBoom v. Raining Rose, Inc.*, 772 N.W.2d 1, 8 (Iowa 2009) (noting that "particularly suspicious" timing, while not determinative, may be evidence of a discriminatory motive).  This short turnaround defied Chief Wingert's assurance that he would dwell on Hunter's case for more

---

that "an employee can also show he is a qualified individual by identifying another position to which he could have been reassigned").

than "a day or two." Hunter also pointed to evidence of mental-health stigma among police department leadership, including Chief Wingert's comments about Sergeant Morgan's suicide and the denial of burial honors. *See McClure v. E. I. du Pont de Nemours & Co.*, 23 N.W.3d 33, 47 (Iowa 2025) (explaining "[e]vidence of a discriminatory atmosphere can be relevant" to showing an employer's state of mind); *Valdez v. W. Des Moines Cmty. Sch.*, 992 N.W.2d 613, 640 (Iowa 2023) (noting evidence of past discrimination may be more relevant when "the same decisionmakers were involved").

In addition, Hunter introduced comparator evidence suggesting non-disabled Des Moines police officers have received less serious discipline after engaging in equal or greater misconduct. *See Feeback v. Swift Pork Co.*, 988 N.W.2d 340, 350 (Iowa 2023) (explaining an inference of discrimination may be found where a disabled plaintiff was treated differently than other non-disabled employees disciplined for violations of "comparable seriousness" (citation omitted)). This evidence showed that the City retained other officers despite standard-of-conduct violations for involvement in off-duty bar fights, interference with an investigation, use of excessive force, and inappropriate sexual conduct. Unlike Hunter, none of the officers disciplined for those incidents attributed their behavior to PTSD.[5]

---

[5] The City contends that none of these employees were similarly situated to Hunter, and so the jury "should not have learned of the comparator evidence." We agree with Hunter that the City failed to preserve error on this issue because it did not object when the evidence was offered at trial. *See Quad City Bank & Trust v. Jim Kircher & Assocs., P.C.*, 804 N.W.2d 83, 89 (Iowa 2011) ("[E]rror claimed in a court's ruling on a motion in limine is waived unless a timely objection is made when the evidence is offered at trial."). The City argues that it was not required to object because the district court's ruling denying its motion in limine to exclude the

Whether a discriminatory motive played a role in an adverse employment decision is an elusive question of subjective intent and—on this record—one that was properly left for the jury. From the circumstantial evidence presented by Hunter, a reasonable factfinder could infer that his PTSD was a motivating factor in the disciplinary decision.[6] We reject the City's argument that it is nevertheless entitled to judgment because it would have made the same decision regardless of Hunter's disability. *See Vroegh v. Iowa Dep't of Corr.*, 972 N.W.2d 686, 696 (Iowa 2022) (describing the "same-decision" affirmative defense). The burden is on the employer to make that showing. *Hawkins*, 929 N.W.2d at 272. Given Hunter's evidence that other officers received lesser discipline for serious misconduct, we cannot conclude that this is the "exceptional case" in which the City's affirmative defense must prevail as a matter of law. *Bessman v. Harding*, 176 N.W.2d 129, 130 (Iowa 1970).

---

evidence was final. But that exception applies only when the court's ruling "leaves no question that the challenged evidence will or will not be admitted at trial." *Id.* at 90. The ruling here was equivocal, with the court stating that it would allow the evidence "at least at this stage." *See State v. Curtis*, No. 22-1069, 2023 WL 4104116, at * 3 (Iowa Ct. App. June 21, 2023) (noting the "use of the term 'at this time' suggests that there might have come a time during the trial where the ruling could be reconsidered" and finding the limine ruling was not final). An objection was accordingly required. *Cf. Quad City Bank*, 804 N.W.2d at 90–91 (finding a limine ruling was final when the court "did not equivocate or state it would reconsider its ruling at trial").

[6] We reach this conclusion based on the record evidence and not, as Hunter urges, because terminating an employee "based on conduct shown to be causally connected to the employee's disability" satisfies the motivating-factor standard as a matter of law. *Boelman v. Manson State Bank*, 522 N.W.2d 73, 77 (Iowa 1994). The jury in this case was not instructed to evaluate the motivating-factor element based on the cause of Hunter's misconduct.

Because substantial evidence supports a finding in Hunter's favor on each element of his disability discrimination claim, we conclude the district court did not err in denying the City's motion for judgment notwithstanding the verdict.

## B.    Failure to Accommodate

The City next claims it was entitled to judgment as a matter of law on Hunter's failure-to-accommodate claim because "Hunter never requested an accommodation for his PTSD" and, even if he did, an excuse from past misconduct is not a reasonable accommodation.[7]  We agree on the latter point.  As a matter of law, Hunter failed to show he was denied a reasonable accommodation.

To establish a claim for failure to accommodate, the plaintiff "must prove he was a qualified individual, his employer knew of his disability, he requested a reasonable accommodation, and he suffered an adverse employment action." *Rumsey*, 962 N.W.2d at 22.  Unlike the disability discrimination claim, a plaintiff who alleges a failure to accommodate need not show discriminatory intent.  *See Withers v. Johnson*, 763 F.3d 998, 1003 (8th Cir. 2014).  Still, failure to accommodate "is not . . . a strict-liability claim." *Rumsey*, 962 N.W.2d at 31.  An employer cannot be liable when the plaintiff's disability is neither obvious nor disclosed.  *Deeds v. City of Marion*, 914 N.W.2d 330, 341, 346 (Iowa 2018)

---

[7] Hunter asserts that the City failed to preserve error on its challenge to the reasonableness of the requested accommodation.  We disagree.  In moving for a directed verdict at trial, the City argued in part that "Mr. Hunter has not shown what could have been done to reasonably accommodate him" and that "ignoring past misconduct is not a reasonable accommodation."  The district court rejected this argument, which the City unsuccessfully renewed in its post-trial motion.  Error is preserved.  *See Ragee v. Archbold Ladder Co.*, 471 N.W.2d 794, 798 (Iowa 1991) (explaining review for denial of a motion for judgment notwithstanding the verdict is "proper as to those grounds raised in [the] defendant's directed verdict motion").

(explaining an "employee can't expect the employer to read his mind," and so an employer is typically not liable "for failing to accommodate a disability of which it had no knowledge" (citation omitted)). And while employers have a duty to "work in concert to achieve a reasonable accommodation once the employee has expressed a desire"—commonly known as the "interactive process"—it is the plaintiff's burden to "show a specific [accommodation] was available." *Casey's Gen. Stores*, 661 N.W.2d at 521; *see also Slaughter v. Des Moines Univ. Coll. of Osteopathic Med.*, 925 N.W.2d 793, 809 (Iowa 2019).

The parties dispute exactly when Hunter requested an accommodation for his PTSD and exactly what accommodation he sought. Hunter argues that he alluded to his need for assistance at several points in the disciplinary process, albeit in an "initially vague" manner, and that he definitively expressed a desire for accommodation after disclosing his diagnosis to Chief Wingert.[8] At trial, Hunter testified that he was looking for "any type of accommodation that would allow [him] to remain employed, seek the help that [he] needed, possibly . . . a transfer or something [of] that nature." The City contends that Hunter's communications before the pre-disciplinary meeting were insufficient to give notice of a mental disability and that Hunter's only requests during that meeting—for a "second chance" and time to get "back to the place where [he] was"—are unreasonable as

---

[8] To be sure, there is no evidence that Hunter ever asked for an "accommodation" during his pre-disciplinary meeting. When asked at trial whether he requested "an accommodation for your PTSD during that meeting," Hunter answered, "No." On appeal, Hunter argues that his comments to Chief Wingert, while indirect, were legally sufficient to trigger the interactive process.

a matter of law. Ultimately, we need not reach most of these questions.[9]  Even accepting Hunter's interpretation of the facts (as we must for purposes of our review), the timing of his accommodation request defeats his claim.

Iowa courts have made clear that "an employee who engages in terminable conduct cannot avoid the consequences of his actions by then requesting an accommodation for those actions." *Rumsey*, 962 N.W.2d at 31 (citing *Schaffhauser v. United Parcel Serv., Inc.*, 794 F.3d 899, 906 (8th Cir. 2015)).  In *Rumsey*, a plaintiff with a hearing disability requested a sign language interpreter for a meeting with human resources but was fired for insubordination before the meeting occurred. *Id.* at 18–19.  Reviewing his claims for failure to accommodate and retaliation, the supreme court observed that "requesting an accommodation following . . . insubordinate conduct [is] too little too late." *Id.* at 32.  But because the record involved factual disputes about the extent of the misconduct and the basis for termination, the court affirmed the denial of a directed verdict. *Id.*

In another case, our court similarly found that an employee could not excuse himself from discipline by attributing his derogatory outbursts to a chemical addiction. *Fitzgerald v. Hy-Vee, Inc.*, No. 16-0462, 2017 WL 936121, at *10 (Iowa Ct. App. Mar. 8, 2017).  Following the same line of federal decisions later cited in *Rumsey*, we explained that "liability is not established where an employee engages

---

[9] Nor do we need to speculate how the jury answered them.  The district court's marshalling instruction permitted a verdict in favor of Hunter if the jury found, among other elements, that the City failed to provide "time as requested" or "any other reasonable accommodation."  A separate instruction listed "rotating employee job duties," "job restructuring," "time off," "assistance from other employees," and "modifications of equipment" as examples of reasonable accommodations.

in misconduct, learns of an impending adverse employment action, and then informs his employer of a disability that is the supposed cause of the prior misconduct and requests an accommodation." *Id.* (cleaned up). The employee in *Fitzgerald* admitted that the misconduct occurred, and there was no genuine dispute that he was fired for that reason. *Id.* at *3, *8. So, we affirmed summary judgment for the employer. *Id.* at *10.

The misconduct rule recognizes the forward-looking purpose of the reasonable-accommodation requirement. The EEOC has explained that "reasonable accommodation is always prospective," and so it is "in the employee's interest to request a reasonable accommodation before performance suffers or conduct problems occur." U.S. Equal Emp. Opportunity Comm'n, *Enforcement Guidance: Reasonable Accommodation and Undue Hardship Under the Americans with Disabilities Act* at 36 & n.103 (Oct. 17, 2002). Consistent with that guidance, federal appellate courts have regularly rejected failure-to-accommodate claims based on requests to excuse past misconduct. *See, e.g.*, *Hrdlicka v. General Motors, LLC*, 63 F.4th 555, 571 (6th Cir. 2023) (finding an employee's "last-minute request for a transfer" was unreasonable after she had violated the terms of final-warning attendance letter); *Trahan v. Wayfair Maine, LLC*, 957 F.3d 54, 66 (1st Cir. 2020) (affirming summary judgment where an employee's request for a new seat assignment to accommodate her previously undisclosed PTSD symptoms "would have required forgiveness of her fireable misconduct and a fresh start at Wayfair"); *Dewitt v. Sw. Bell Tel. Co.*, 845 F.3d 1299, 1317–18 (10th Cir. 2017) (finding a customer service employee's alleged request for an accommodation after dropping customer calls was, at most, an unreasonable

"request for retroactive leniency"); *Schaffhauser*, 794 F.3d at 906 (finding an employee's request to keep his position despite a racist remark attributed to his medical impairment was not a request for reasonable accommodation).

The uncontested facts in this case compel the same result. Hunter does not contend that he ever requested an accommodation for his PTSD before his arrest on June 5, 2021. Indeed, Hunter testified that he did not appreciate his need for help until after that date. Prior to his arrest, when Hunter experienced symptoms of his mental-health decline, he took affirmative steps to hide them from the department. He did not disclose Dr. Grove's initial diagnosis to Dr. Ascheman during his fitness-for-duty appointment. He asked Sergeant Ballantini to keep his off-duty breakdown a secret. And he denied any distress from the May 31 suicide call when two officers asked him if he was okay. These decisions deprived the City of any opportunity to accommodate Hunter's mental-health decline before it impacted his performance. *See Deeds*, 914 N.W.2d at 341 ("It is well established that the employee or applicant bears the burden of informing the employer of his or her disability."). Only after his arrest, while on administrative leave and awaiting discipline, did Hunter seek assistance managing the symptoms of his PTSD.[10] At that point, precisely what Hunter wanted—time off, a reassignment, or

---

[10] We recognize that Hunter was not formally diagnosed with PTSD until shortly before his termination. However, that development had no effect on his accommodation rights. Under chapter 216, a disability is identified by its symptoms, not by its label. *See* Iowa Code § 216.2(5) (2021) ("'Disability' means the physical or mental condition of a person which constitutes a substantial disability . . . ."); *McClure*, 23 N.W.3d at 42 (explaining a substantial disability is one that "substantially limits one or more major life activities"); *Barnes v. Nw. Iowa Health Ctr.*, 238 F. Supp. 2d 1053, 1069 (N.D. Iowa 2002) (noting "diagnoses alone are insufficient to qualify a person as disabled" for purposes of state and federal discrimination statutes "because symptoms vary in degree and extent from person

something else—was immaterial. Any accommodation he might have identified was *in lieu* of termination. As Hunter's appellate brief succinctly puts it, he was asking "to keep his job." Such a request is "better understood as a plea either for forgiveness or for a second chance." *Trahan*, 957 F.3d at 66. It cannot support a claim for failure to accommodate. *Rumsey*, 962 N.W.2d at 31; *Fitzgerald*, 2017 WL 936121, at *10; *see also McElwee v. County of Orange*, 700 F.3d 635, 641 (2d Cir. 2012) ("A requested accommodation that simply excuses past misconduct is unreasonable as a matter of law.").

Hunter counters that employers "are still prohibited from treating disabled employees worse than their non-disabled peers." We agree that the City may not impose harsher discipline on Hunter because of his PTSD. But that's the premise of his separate claim for disability discrimination. Hunter's failure-to-accommodate claim, by contrast, suggests that an employer must privilege a disabled employee by excusing misconduct for which a non-disabled coworker would be terminated. That is not what the Iowa Civil Rights Act provides. *See Casey's Gen. Stores*, 661 N.W.2d at 524 n.5 (explaining "our statute protects against disability" discrimination but "does not establish a preference for disabled workers").

Even when viewing the record in the light most favorable to Hunter, no reasonable juror could find he requested a reasonable accommodation for his PTSD. His only request was for leniency toward his prior misconduct. The district

---

to person"). So, even if Hunter did not know his mental-health condition was diagnosable prior to his June 5 misconduct, that does not excuse his failure to alert the City to his symptoms.

court erred by denying the City's motion for judgment notwithstanding the verdict on Hunter's failure-to-accommodate claim.

### C. Jury Instructions

Having addressed the City's challenges to the merits, we turn to its claims of instructional error. The City contends it is entitled to a new trial because the district court gave the jury an instruction that altered the elements of Hunter's discrimination claim and because it refused to give two other instructions proposed by the City.

"We review the district court's jury instructions for prejudicial error, considering the instructions as a whole." *Des Moines Civ. & Hum. Rts. Comm'n v. Knueven*, 988 N.W.2d 694, 700 (Iowa 2023). The court's instructions must "convey the applicable law in such a way that the jury has a clear understanding of the issues it must decide." *Boyle v. Alum-Line, Inc.*, 710 N.W.2d 741, 749 (Iowa 2006). Reversal is warranted where the instructions have "misled the jury" or where the court "materially misstates the law." *DeBoom*, 772 N.W.2d at 5 (citations omitted).

### 1. Instruction 26

At trial, Hunter asked the district court to deliver a jury instruction on "stereotypes." The proposed instruction—which was later adopted verbatim as Instruction 26—stated:

> Unlawful discrimination sometimes happens without the decisionmaker having planned, thought out, or even acknowledged to himself or herself that it is taking place. The law acknowledges the effects of society's stereotypes on employers in their decision making, and that biased decision making based upon those stereotypes can violate the law, *even if the decisionmaker is unaware of bias in his or her thinking*. This is because the law's purpose is to

eradicate discrimination in all forms, regardless of the personal character of the individuals making discriminatory decisions.

If you find from all the surrounding circumstances that Defendant treated Matthew Hunter differently than they would have if he had not had a disability or if he had not requested a reasonable accommodation—*even if the managers do not acknowledge or realize their own motives*—you may find in favor of Mr. Hunter.

(Emphasis added.)

The City objected to the instruction, arguing Iowa's motivating-factor standard precludes liability for discriminatory motives that decision-makers "do not acknowledge or realize." Hunter responded that the instruction would not change his burden to show the City "treated [him] differently because of his disability"—it merely clarified that "intentional animus" is not required. The district court concluded the instruction was appropriate because it seemed to describe "implicit bias." On appeal, the City maintains the instruction materially misstated the law.

Our supreme court has recognized "two distinct theories of liability" for discrimination in employment: disparate impact and disparate treatment. *Pippen v. State*, 854 N.W.2d 1, 9 (Iowa 2014). Disparate impact cases involve "facially neutral employment practices or fixed qualifications that in fact impact one group, such as the disabled, more harshly than others." *Casey's Gen. Stores*, 661 N.W.2d at 519 n.2. In those cases—which are analyzed under a distinct legal framework—liability is based on objective effects, "not the subjective motivation of the employer." *Pippen*, 854 N.W.2d at 9. By contrast, "[i]n a disparate treatment case, the plaintiff bears the burden of showing he or she has been harmed by discriminatory animus of the employer." *Id.*

As Hunter states in the first line of his appellate brief, this is a "case of disparate treatment." So, contrary to his argument to the district court, intentional

animus is the defining element of his disability discrimination claim. *Iowa C.R. Comm'n v. Woodbury Cnty. Cmty. Action Agency*, 304 N.W.2d 443, 451 (Iowa Ct. App. 1981) (rejecting a plaintiff's argument "that under Iowa law, proof of intent to discriminate is not required" to prove a disparate-treatment claim). To return a verdict in Hunter's favor, the jury had to find his disability was a motivating factor that "'played a part' in the [City's] decision" to terminate his employment. *Haskenhoff*, 897 N.W.2d at 582 (citation omitted). A decision is "a determination arrived at after consideration." *Decision*, *Webster's Third New International Dictionary* 585 (unabr. ed. 2002). Iowa law does not recognize a disparate-treatment claim based on unconsidered, unintentional, or unconscious discrimination.[11] Hunter cites no authority to the contrary.[12]

---

[11] We recognize that in *Palmer College of Chiropractic v. Davenport Civil Rights Commission*, our supreme court stated that the American with Disabilities Act (ADA) and the Rehabilitation Act "specifically prohibit discrimination against those with disabilities based not just on 'affirmative animus,' but also any discrimination based on thoughtlessness, apathy, or stereotype." 850 N.W.2d 326, 333 (Iowa 2014) (explaining our appellate courts often look to the ADA and the Rehabilitation Act for guidance in analyzing disability discrimination claims under the IRCA). But the court in *Palmer* was not concerned with whether the claimant was denied benefits because of his disability—that question was not disputed. Instead, the only question the court considered was whether the claimant was entitled to participate in an educational program with reasonable accommodation. *Id.* at 335.

[12] Hunter's appellate brief invokes several federal cases in support of his argument that Instruction 26 was an accurate statement of the law. We have reviewed each of those cases and find none are informative. *See Stacks v. Sw. Bell Yellow Pages, Inc.*, 27 F.3d 1316, 1324 (8th Cir. 1994) (applying the motivating-factor standard and finding employer's gender animus "actually motivated the challenged decision"); *Brooks v. Woodline Motor Freight, Inc.*, 852 F.2d 1061, 1064 (8th Cir. 1988) (quoting language from a now-overruled Seventh Circuit decision); *Moe v. Grinnell Coll.*, 556 F. Supp. 3d 916, 932 (S.D. Iowa 2021) (describing "use of biased perspectives or stereotypes" as circumstantial evidence of discrimination in Title IX disciplinary proceedings); *E.E.O.C. v. W&O, Inc.*, 213 F.3d 600, 611 (11th Cir. 2000) (finding a "lack of ill will" is not incompatible with the "malice" and "reckless indifference" standards for punitive damages under Title VII).

On two other occasions, our court has reviewed challenges to jury instructions featuring near-identical language to Instruction 26. However, the panels in those cases did not decide whether the disputed instruction accurately described the law. *See Vetter v. State*, No. 16-0208, 2017 WL 2181191, at *10 (Iowa Ct. App. May 17, 2017) ("We need not decide whether the instruction was a proper statement of law because the instruction was inapplicable to the facts of Vetter's case."); *Butcher v. City of Mason City*, No. 13–1622, 2014 WL 6681033, at *5–6 (Iowa Ct. App. Nov. 26, 2014) (affirming rejection of proposed instruction because, among other reasons, the applicable law was stated in other instructions). We reach that question here. By permitting the jury to find the City liable for a motive Chief Wingert did not "acknowledge or realize" he had, Instruction 26 negated the intentionality requirement for a disparate-treatment claim and undermined the well-established motivating-factor standard. It is a misstatement of the law.

We acknowledge the district court's error was due in part to its belief that Instruction 26 concerned implicit bias. Over the last few decades, courts and commentators have emphasized the importance of policing implicit bias in jury trials. *See, e.g.*, *United States v. Young*, 6 F.4th 804, 810–12 (8th Cir. 2021) (Kelly, J., concurring); Mark W. Bennett, *Unraveling the Gordian Knot of Implicit Bias in Jury Selection: The Problems of Judge-Dominated Voir Dire, the Failed Promise of Batson, and Proposed Solutions*, 4 Harv. L. & Pol'y Rev. 149, 165–70 (2010). Our own supreme court has "strongly encourage[d] district courts to be proactive about addressing implicit bias," including through the use of cautionary instructions. *State v. Plain*, 898 N.W.2d 801, 817 (Iowa 2017). But there's a

difference between an instruction that "ask[s] the jurors to consciously reflect on their decisionmaking process" and one that substantively alters the decision they must make. *Id.* at 816. Instruction 26 did not seek to prevent biased deliberation; it retooled the essential elements of Hunter's disability discrimination claim.

Hunter contends that any error in Instruction 26 is harmless.[13] It is true that we "do not require perfection" when reviewing for instructional error. *Rivera v. Woodward Res. Ctr.*, 865 N.W.2d 887, 902 (Iowa 2015). Reversal is not warranted "if a full and fair reading of all of the instructions leads to the inevitable conclusion that the jury could not have misapprehended the issue." *Id.* at 904 (cleaned up). But the burden is on Hunter to show a lack of prejudice, *id.* at 903, and he cannot do so on this record.

Instruction 26 improperly expanded the legal standard in the court's motivating-factor instruction, tipping the scales in Hunter's favor on one of the most fiercely contested issues in this case. Although we have determined that Hunter presented sufficient circumstantial evidence to avoid a directed verdict on the motive element of his discrimination claim, that evidence was far from conclusive. The City introduced persuasive evidence that Hunter was fired for his misconduct alone—not the least of which was a written recommendation for termination predating his diagnosis. It is not difficult to imagine a juror who found no discriminatory intent in Chief Wingert's decision, but who nevertheless agreed to

---

[13] Hunter also argues that the City has allowed the language of Instruction 26 to be submitted in prior litigation involving some of the same attorneys. But he provides no authority to suggest the City's acquiescence in other cases would preclude its objection here. We therefore decline to consider the issue further. *See* Iowa R. App. P. 6.903(2)(a)(8)(3).

return a verdict for Hunter based on speculation about the chief's unconscious motives.

Because Instruction 26 contained a material misstatement of the law, the City is entitled to a new trial on Hunter's disability discrimination claim. *See DeBoom*, 772 N.W.2d at 14.

### 2. City's Proposed Instructions

We briefly address the City's other two claims of instructional error, as they present issues likely to arise on retrial. *See Hawkins*, 929 N.W.2d at 268. First, the City contends the district court erred by rejecting the City's proposed "Rules of Conduct" instruction, which provided:

> When an employee violates an employer's rules of conduct, and was guilty of egregious behavior, the employer is within its rights to terminate the employee for such behavior.

Second, the City argues the court erred by refusing to give a proposed instruction on comparator evidence. That one stated in relevant part:

> Plaintiff's claim asserts that other employees, who are not disabled, are comparators to him and demonstrate the Defendant's differential treatment of him. In considering whether a fellow employee is a comparator, you should consider the following:
> . . . .
> The individuals used for comparison must have dealt with the same supervisor, have been subject to the same standards, and engaged in the same conduct without any mitigating or distinguishing circumstances.

A district court must issue a proposed jury instruction when it "correctly states the law, has application to the case, and is not stated elsewhere in the instructions." *DeBoom*, 772 N.W.2d at 5. Here, we find no error in the court's rejection of the City's proposals.

The notion that an employer is "within its rights to terminate [an] employee for [egregious] behavior" was encompassed by other instructions provided to the jury. Instruction 15, which the parties refer to as a "business judgment" instruction, admonished the jury not to "return a verdict for [Hunter] just because you might disagree with the [City's] decision or believe it to be harsh or unreasonable." And Instruction 16, which addressed the same-decision defense, prohibited the jury from awarding damages if it found the City "would have terminated [Hunter] regardless of his disability." When read alongside the elements of Hunter's discrimination claim, these instructions make clear that the City was entitled to terminate Hunter for misconduct—so long as his disability played no part in the decision.

As for the City's comparator instruction, our supreme court recently explained that a discrimination plaintiff may rely on comparator evidence to prove pretext so long as "the other employees were similarly situated in all relevant respects." *Feeback*, 988 N.W.2d at 350 (cleaned up). In *Feeback*, the court noted the Eighth Circuit's rule that "individuals used for comparison must have . . . engaged in the same conduct without any mitigating or distinguishing circumstances." *Id.* (quoting *Gardner v. Wal-Mart Stores, Inc.*, 2 F.4th 745, 750 (8th Cir. 2021)). But it declined to adopt that stringent standard. *Id.* (clarifying that "Feeback need not show the other employees committed 'the exact same offense'"). Instead, it found a plaintiff may point to "other employees whose violations were of *comparable seriousness*." *Id.* The City's proposed instruction overextended *Feeback's* standard for comparators.

**III.    Conclusion**

For the reasons discussed above, we reverse the denial of the City's motions for new trial and judgment notwithstanding the verdict.  We remand to the district court for retrial on Hunter's disability discrimination claim and dismissal of Hunter's failure-to-accommodate claim.  Given this disposition, we do not reach the City's evidentiary challenges.  Finally, because Hunter is no longer the prevailing party, we vacate the district court's award of costs, expenses, and attorney fees.  *See Knueven*, 988 N.W.2d at 705.

**REVERSED AND REMANDED.**

Greer and Ahlers, JJ., concur; Sandy, J., dissents, in which Tabor, C.J., joins.

**SANDY, Judge** (dissenting)**.**

I write to depart from my colleagues' holding in several respects. I first disagree with the majority's holding that Hunter's failure-to-accommodate claim fails as a matter of law. The majority opinion chides Hunter for not informing the police department or his superiors of his distress relating to Morgan's suicide prior to his June 2021 arrest, reasoning it deprived the City of any opportunity to accommodate Hunter's mental-health decline. But Hunter was not diagnosed with PTSD until days before the City terminated his employment—well after the arrest. And the majority further asserts that, at that point, "precisely what Hunter wanted— time off, a reassignment, or something else—was immaterial. Any accommodation he might have identified was *in lieu* of termination."

The majority essentially holds that Hunter was completely barred from making a reasonable request for accommodation once he received his PTSD diagnosis. That view is at odds with Iowa law that "[w]hen an individual becomes disabled, from whatever cause, during a term of employment, the employer shall make every reasonable effort to continue the individual in the same position or to retain and reassign the employee and to assist that individual's rehabilitation." *Goodpaster v. Schwan's Home Serv., Inc.*, 849 N.W.2d 1, 17 (Iowa 2014) (quoting Iowa Admin. Code r. 161—8.28). The majority provides no authority for the proposition that the employee owes a duty to divulge medical symptoms to any employer before they have ever received a disability diagnosis. And whether the purported pre-diagnosis "symptoms" Hunter experienced should have alerted him to the possibility that he was disabled to the point of requiring accommodation is a fact question for the jury. There are many scenarios, as is the case here, where

an employee may be unaware of the existence of their disability until the fallout of a disability-induced incident is occurring. The benefits of hindsight then allows the terminating employer to point to past manifestations of the disability of which the employee failed to apprise the employer. But whatever symptoms a disabled employee exhibited in the past, that employee cannot be expected to request a reasonable accommodation for a disability before he was ever diagnosed.

I would further argue that Hunter did request reasonable accommodation and would not dismiss his request as one "that simply excuses [his] past misconduct." *See McElwee v. County of Orange*, 700 F.3d 635, 641 (2d Cir. 2012). Hunter testified that he requested time off:

> CITY ATTORNEY: You told the chief you needed time and treatment to get back to working; is that correct?
> HUNTER: I believe so.
> CITY ATTORNEY: You told the chief that you needed time and treatment to get back to duty. How much time did you need?
> HUNTER: At the time I did not know.
> CITY ATTORNEY: How much time would you have needed to get back to work at that time?
> HUNTER: I believe with an accommodation of being somewhere else within the department, I don't think I was asking for an indefinite period of time.

By informing the chief he "needed time and treatment," Hunter met his "not . . . onerous" burden "to propose an accommodation."[14] *Slaughter v. Des*

---

[14] Conversely, the requests made in the cases cited by the City are easily distinguishable from Hunter's request—many of those cases involve requests that the employer excuse the employee's poor behavior with no accompanying request for an accommodation. *See McElwee v. County of Orange*, 700 F.3d at 641 (making no discernable accommodation request beyond the employee's mother suggesting employee's supervisor should speak with employee's therapist and to "educate" employee's stalking victims "that they [should] be more tolerant of his behavior"); *DeWitt v. Sw Bell Tel. Co.*, 845 F.3d 1299, 1316 (10th Cir. 2017) (involving terminated call center employee that "did not request a reasonable accommodation to address concerns regarding the possibility of dropped calls;

*Moines Univ. Coll. of Osteopathic Med.*, 925 N.W.2d 793, 805 (Iowa 2019). And Hunter's failure to delineate a specific form of accommodation does not lessen the City's burden to provide him with reasonable accommodation. *See Fjellestad v. Pizza Hut of America, Inc.*, 188 F.3d 944, 953 (8th Cir. 1999) ("The interactive process would have little meaning if it . . . allow[ed] employers, in the face of a request for accommodation, simply to sit back passively, offer nothing, and then, in post-termination litigation, try to knock down every specific accommodation as too burdensome." (citation omitted))

The majority cites *Trahan v. Wayfair Maine, LLC.* in support of its conclusion that Hunter requested an excuse for his conduct rather than a reasonable accommodation. 957 F.3d 54, 66 (1st Cir. 2020). The accommodation request at issue in *Trahan* differed significantly from Hunter's request. There, the terminated employee had been diagnosed with PTSD at least seven years[15] before the misconduct leading to her termination and long before she was hired by the terminating employer. *See Trahan*, 957 F.3d at 57. The *Trahan* court found that the employee's decision to request accommodation "only after it became clear that

---

instead, she requested retroactive leniency for her misconduct"); *Siefken v. Vill. of Arlington Heights*, 65 F.3d 664, 666 (7th Cir. 1995) ("When asked what accommodation Siefken would request, his counsel replied, 'A second chance.' But this is not an accommodation . . . ."); *Burch v. Coca-Cola Co.,* 119 F.3d 305, 319 n.14 (5th Cir. 1997) ("Burch did not request an accommodation, he requested to return to his position as he left it . . . [and] sought no changes to his position and desired nothing more than the ability to resume his career where he had left it.").

[15] The other cases cited by the majority in support of its excuse-for-misconduct analysis involve similar facts—a terminated employee who had been disabled since birth, *see Rumsey v. Woodgrain Millwork, Inc.*, 962 N.W.2d 9, 16–17 (Iowa 2021), an employee who knew about his disability for months before his termination, *see Fitzgerald v. Hy-Vee, Inc.*, No. 16-0462, 2017 WL 936121, at *3 (Iowa Ct. App. Mar. 8, 2017), and a man whose alleged disability had existed since birth, *see McElwee*, 700 F.3d at 637.

an adverse employment action was imminent" cut against her request for accommodation. *Id.* at 65–66.

That reasoning does not apply to Hunter—he was not diagnosed with PTSD until adverse employment action was imminent. So although Hunter clearly expressed a desire to keep his job—that is an employee's obvious intention for any accommodation request—the timing of his request does not raise suspicion as an excuse for misconduct in the same way that the request of an employee who has known about their disability for years and failed to disclose their need for an accommodation would. Hunter did not simply request a second chance or urge the City to ignore his misconduct—he recognized and testified that his misconduct warranted discipline and specified that he needed time and treatment. Unlike most disability cases, Hunter's situation—from the inciting incident to his disability diagnosis, to his accommodation request, to his termination—unfolded very quickly. This is why the "reasonableness of any proposed accommodation, including its feasibility, must be assessed on a case-by-case basis." *Id.* at 66. The majority opinion fails to grapple with that nuance and instead applies a broad, inflexible approach to Hunter's unique circumstances.

Next, I would find no error in the district court's decision to issue instruction 26, as it does not misstate Iowa law and does not disturb previous instructions on intent to discriminate. In my view, the majority has overstated the power of that instruction.

The City argues that instruction 26's clause permitting the jury to find discriminatory intent "even if the managers do not acknowledge or realize their own motives" allows for an employer to be held liable for disability discrimination even

without considering an individual's disability. But we do not evaluate instructions "piecemeal" or "in artificial isolation"—we view them "as a whole" when determining if they are sufficient "to convey the applicable law." *Manno v. McIntosh*, 519 N.W.2d 815, 823 (Iowa Ct. App. 1994). And the other instructions clearly instructed the jury that they could only find the City engaged in disability discrimination if "[Hunter]'s disability was a motivating factor" in the City's termination decision. The instructions further provided that his "disability was a 'motivating factor' in the [City]'s decision to terminate [Hunter's] employment. . . . Hunter's disability must have been one of the reasons for the termination, but it need not have been the only reason." Thus, regardless of how the jury interpreted the implicit bias aspect of Instruction 26, they were still expressly required to come to a find that discrimination was one of the reasons for Hunter's termination.

Additionally, Instruction 26 does not misstate the law. Our supreme court has stated prohibited discrimination is "based not just on 'affirmative animus,' but also any discrimination based on thoughtlessness, apathy, or stereotype." *Palmer Coll. of Chiropractic v. Davenport C.R. Comm'n*, 850 N.W.2d 326, 333 (Iowa 2014) (citing *Alexander v. Choate*, 469 U.S. 287, 295–97 (1985), which noted that discrimination against the handicapped is primarily the result of apathetic attitudes rather than affirmative animus).

When certain discriminatory attitudes are held universally, it becomes less likely that many discriminatory acts associated with those attitudes will consciously be thought about. As an example, it is possible that discrimination against PTSD is so widespread and socially accepted in the police community that many related acts of discrimination against individuals with PTSD would be routine and ignored.

This does not make those discriminatory acts any less deliberate. Indeed, the more pervasive a discriminatory attitude is, the less likely its purveyors are to expressly consider their discriminatory acts in relation to those attitudes. Thus, Instruction 26 becomes relevant in such cases—informing jurors that sometimes a decision maker may be "unaware of bias in his or her thinking." Accordingly, I would conclude the district court committed no error in issuing the instruction.

I would hold that Instruction 26 was not a material misstatement of the law and would uphold the district court's issuance of the instruction. And because Hunter requested an accommodation and the City proceeded to terminate him rather than explore further options, I conclude that a rational trier of fact could have found the City failed to accommodate Hunter's disability, and the district court did not err by denying the City's motions on this issue. I thus respectfully dissent.